# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION
### CASE NO. 5:12-CV-00163

**DAVID GRIFFIN**                                                    **PLAINTIFF**

**v.**

**CHARLES A. JONES,** *et al.*                                    **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the Court on a motion to dismiss by Defendants Charles

A. Jones, CA Jones Management Group, LLC, Global Book Resellers, LLC, and

Technology Associates, Inc. (Docket No. 21). The Plaintiff Responded (Docket No. 23).

The Defendants replied (Docket No. 25). The Plaintiff filed a surreply (Docket No. 36).

Fully briefed, the matter is now ripe for adjudication. For the following reasons, the

Defendants' motion is DENIED.

## BACKGROUND

Plaintiff David Griffin ("Griffin") brings suit against Defendants Charles Jones

("Jones"), CA Jones Management Group, LLC, Global Book Resellers, LLC, and

Technology Associations, Inc. (collectively ("Defendants").[1] Griffin asserts six separate

causes of action against the Defendants. Among Griffin's allegations is that the

Defendants violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b-5 of the act's implementing regulations, 17 C.F.R. § 240.10b-5, by making

fraudulent statements of material fact or omitting to state material facts in connection

---

[1] Griffin has also named Sarah Jones ("Sarah") as a defendant in this action. Sarah filed her own motion to dismiss (Docket No. 22). That motion has been resolved by entry of a separate memorandum opinion and order by the Court on this date.

with the purchase of securities in a number of companies jointly owned by Griffin and Jones.

As required when deciding a motion to dismiss, the Court presumes that the allegations in the first amended complaint are true. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). Taking them as true, the relevant facts are as follows.

This action arises from a soured business relationship between David Griffin and Charles Jones. Four interrelated businesses are at the center of this dispute. In 1993, Jones founded Integrated Computer Solutions, Inc. ("ICS") and installed himself as an officer of the company. Some years later, in March 2008, Jones also formed Blackrock Investments, LLC ("BRI), of which he was the controlling member. In May 2008, BRI formed a subsidiary, SE Book Company, LLC ("SEB") for the purpose of acquiring a textbook company in Murray, Kentucky. Initially, SEB was wholly owned and managed by its sole member, BRI. In July 2008, SEB's operating agreement was amended, and ICS was added as an eight percent member of SEB. In March 2009, College Book Rental Company, LLC ("CBR") was formed. ICS also owns an eight percent interest in CBR, with the remaining interest held by BRI. Further details of CBR's formation are discussed below.

An entity separate from ICS, BRI, SEB, and CBR also figures prominently into the present dispute. In June 2008, Jones formed CA Jones Management Group, LLC ("CJM"). As detailed herein, management responsibilities for ICS, BRI, SEB, and CBR were eventually delegated to CJM, but CJM never had an ownership stake in any of those

companies.  CJM was paid management fees from the companies for its services, which were allegedly paid to Jones and his wife as owners of CJM.

Griffin became involved in ICS, BRI, and SEB in 2008.  Toward the beginning of that year, Jones approached Griffin about investing in ICS.  As a result of the solicitation, Griffin bought fifty percent of the outstanding shares of the company for $2 million. Later, in April 2008, Griffin also bought fifty percent of BRI in exchange for $100,000. As alleged, "Griffin made his investments in BRI and ICS based on the expectation that [Jones's] undivided loyalty was devoted to BRI and ICS, and not to other competing companies."  (Am. Compl., DN 18, ¶ 19.)

On February 11, 2009, Jones and Griffin began discussing the formation of CBR for the purpose of renting textbooks to college students.  During these discussions, Jones provided Griffin with forecasts of sales, profits, inventory, and expenses for CBR's first six years of operation.  These forecasts allegedly predicted CBR making profits of $940,000, $2.8 million, and $3.7 million during its first three years of operation, respectively.  (*Id.* ¶ 22.)  Although the forecasts contained projected expenses, Griffin alleges that Jones "omitted any specific allocation for fees to be paid by CBR to CJM" for the purposes of managing the company.  (*Id.*)  CJM allegedly paid CJM management fees of approximately $2.3 million in 2010 and $5.7 million in 2011.  (*Id.*)

In addition to CBR, Griffin alleges that BRI, SEB, and ICS paid CJM significant management fees.  For example, BRI, SEB, and ICS paid CJM management fees totaling $24,000, $2.7 million, and $600,000, respectively, in 2008 alone.  (*Id.* ¶ 30.) Accordingly, Griffin alleges that Jones "deliberately channeled millions of dollars from [ICS, BRI, SEB, and CBR] to CJM," and ultimately into his own pockets as CJM's

managing member.  (*Id.* ¶ 31.)  Overall, Griffin alleges that Jones's ultimate goal was to convince Griffin to invest in ICS, BRI, SEB, and CBR; Jones would then siphon off those investments for his own benefit through payment of management fees to CJM.

Griffin alleges that payment of the exorbitant fees to CJM would not have been possible absent his continued investments in the companies.  For example, beginning in early 2009, Jones allegedly told Griffin that "SEB and CBR were unable to pay operating expenses and did not have the funds necessary to purchase inventory."  (*Id.* ¶ 35.)  To remedy these shortfalls, Jones "asked Griffin for additional investment."  (*Id.*)  In response, "Griffin made additional investments in SEB and CBR in the form of over 100 wire transfers of funds to SEB's and CBR's accounts between April 2009 and June 2012."  (*Id.*)  Griffin claims to have made these transfers in reliance "on misrepresentations by [Jones] and CJM about the current financial health and inventory value of SEB and CBR."  (*Id.*)  For example, Jones allegedly represented to Griffin that SEB would have net income of $2.1 million during the twelve-month period between March 2009 and February 2010.  (*Id.* ¶ 32.)  Again, however, that projection allegedly excluded any management fees to be paid to CJM during the same period.  (*Id.*)

While Griffin was making wire transfers to SEB and CBR between April 2009 and June 2012, he alleges that Jones was increasing the management fees charged by CJM.  For example, Griffin claims that SEB paid CJM $2.4 million and $4.3 million in management fees in 2009 and 2010, respectively, and that these fees far exceeded SEB's net earnings during those years.  (*Id.* ¶¶ 39-40.)  Similarly, CJM was allegedly paid $2.3 million in management fees by CBR in 2010, while the company had a net loss of approximately $1.8 million.  (*Id.* ¶ 41.)

In December 2010, Jones asked Griffin to contribute an additional $10 million to SEB and CBR. (*Id.* at 42.) Griffin expressed concern about the economic viability of the companies in light of his already large investments. Prior to this request, a consulting firm, Commonwealth Economics, had been hired to make recommendations for improving the companies' profitability. In response to Griffin's concerns about additional investments, "Commonwealth Economics again provided recommendations to [Jones] and CJM about ways to increase the profits of [ICS, BRI, SEB, and CBR] with the goal of repaying all amounts owed to Griffin by 2012." (*Id.*) Jones allegedly represented to Griffin that he would implement the recommendations "in order to repay Griffin all amounts he had invested in [ICS, BRI, SEB, and CBR] by 2012." (*Id.* ¶ 43.) In reliance on that promise, "Griffin invested another $9,353,000 in CBR and SEB during the first six months of 2011." (*Id.*) Again, Griffin alleges that Jones did nothing to implement the recommendations and instead paid $5.7 million from CBR to CJM during the first six months of 2011 as management fees. (*Id.* ¶ 45.) During this period, CBR apparently operated at a net loss of $3.6 million. (*Id.*)

Based on the foregoing, Griffin alleges that his contributions and wire transfers to ICS, BRI, SEB, and CBR were transactions in "securities" as that term is used and defined in the Securities Exchange Act of 1934. (*Id.* ¶ 90.) He additionally claims that he made his "investments" in reliance on material misrepresentations and omissions by Jones and CJM. (*Id.*) Finally, he asserts that the Defendants intended to defraud Griffin or were at least reckless in their representations to him regarding the companies' financial health and projections for future profit. (*Id.*) As a result, Griffin alleges that the Defendants' transactions in securities were fraudulent in violation of Section 10(b) of the

Securities Exchange act and Rule 10b-5 of its implementing regulations. He moves the Court to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to consider his state law claims of breach of fiduciary duties, fraud, misappropriation, and unjust enrichment. (*Id.* at 23-27). He urges the Court to find that the funds in question are held on his account in a constructive trust. (*Id.* at 27.)

The Defendants move to dismiss the securities fraud claim as a matter of law and ask the Court to decline to exercise supplemental jurisdiction over the state law claims.

## STANDARD

The Federal Rules of Civil Procedure require that pleadings, including complaints, contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint may be attacked for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the Court will presume that all the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Additionally, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528

F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 US. 544, 555 (2007) (citations omitted). Instead, the plaintiff's [f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). A complaint should contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged — but has not 'show[n]— that the pleader is entitled to relief." *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

In addition to the foregoing, the pleading standard is higher for claims involving allegation of fraud, like the securities fraud claims at issue in this case. When alleging fraud, a plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. 9(b). "A plaintiff's complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Louisiana*

*Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 662 F.3d 471, 478 (6th Cir. 2010) (quoting

*Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)).

On top of the pleading requirements of Rules 8(a)(2), 9(b), and 12(b)(6), the

Private Securities Litigation Reform Act of 1995 ("PSLRA") "imposes additional and

more '[e]xacting pleading requirements' for pleading scienter in a securities fraud case."

*Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

Under the PSLRA's heightened pleading requirements, a plaintiff alleging that the

defendant made a false or misleading statement must:

> (1)    specify each statement alleged to have been
> misleading, the reason or reasons why the statement is
> misleading, and, if an allegation regarding the statement or
> omission is made on information and belief, the complaint
> shall state with particularity all facts on which that belief is
> formed [and]
> (2)    state with particularity facts giving rise to a strong
> inference that the defendant acted with the required state of
> mind.

15 U.S.C. § 78u-4(b)(1), (2).  The PSLRA "requires plaintiffs to state with particularity

both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the

defendant's intention to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 313, 127

S.Ct. 2499 (quotation and citation omitted).


**DISCUSSION**

**I. Griffin's initial investment and subsequent contributions are properly construed
as "securities" within the meaning of the Securities Exchange Act and Rule 10b-5.**

Section 10(b) of the Securities Exchange Act renders it unlawful, in connection

with interstate commerce, to "use or employ, in connection with the purchase or sale of

any security . . . any manipulative device or contrivance in contravention of such rules

and regulations as the [Securities Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b-5 as a result of Section 10(b). Rule 10b-5 makes it unlawful for any person, in connection with interstate commerce, "[t]o make any untrue statement of material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). A violation of Section 10(B) and Rule 10b-5 is referred to broadly as "securities fraud." "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injuries." *Louisiana Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 662 F.3d 471, 478 (6th Cir. 2010) (citation omitted).

The Defendants move to dismiss Griffin's securities fraud claim as a matter of law on at least two grounds. First, they argue that Griffin has insufficiently alleged that they made any misrepresentations or omissions in connection with the purchase of securities in ICS, BRI, SEB, or CBR. Second, they claim that Griffin's "wire transfers," "contributions," or "investments" in the companies do not fall within the definition of "securities" as defined in the Exchange Act. The Defendants' arguments in favor of dismissal are best thought of as addressing two separate timeframes that encompass the underlying facts. The first argument concentrates on Griffin's initial investment, while the second focuses on the additional money that he contributed to the companies.

**A. Griffin's initial investment**

The Defendants first argue that Griffin has insufficiently alleged any misstatements or omissions in connection with his initial investment in the companies. The Court disagrees and finds that Griffin has alleged particular facts that give rise to the strong inference that Defendants acted with the requisite scienter in omitting those facts.

In the complaint, Griffin alleges that he initially invested in ICS and BRI in "early 2008" and in April 2008, respectively. (Am. Compl., DN 18, ¶¶ 17-18.) At that time, he purchased a fifty percent interest in each company. (*Id.*) He invested in BRI and ICS "on the expectation that [Jones's] undivided loyalty was devoted to BRI and ICS, and not to other competing companies." (*Id.* ¶ 19.) In July 2008, it is alleged that Jones "convinced Griffin to make additional investments in BRI and/or SEB in the forms of lines of credit and/or wire transfers." (*Id.* ¶ 20.) Griffin made these investments in reliance "on representations made by [Jones] that such investments in BRI and SEB were necessary for the growth of those Companies and would increase the value of Griffin's initial investments." (*Id.*)

On February 11, 2009, Jones and Griffin first discussed forming CBR to rent textbooks. (*Id.* ¶ 22.) A month later, in March 2009, Jones formed the company. (*Id.* ¶ 16.) Jones allegedly "forecast profits for the first three years of CBR's operation of over $940,000, $2.8 million and $3.8 million, respectively." (*Id.* ¶ 22.) He also made forecasts for sales, inventory, and expenses. (*Id.*) All of the forecasts "were based on the assumption of increasing investments by Griffin in the first three years of CBR's operations of $2 million, $4 million, and $8 million, respectively." (*Id.*) Griffin was induced to make those investments based on "the initial representations by [Jones] about CBR's expected revenues and later representations that CBR's financial viability was

constantly improving[.]" (*Id.* ¶ 23.) In the CBR forecasts, however, Jones "omitted any specific allocation for fees to be paid by CBR to CJM." (*Id.* ¶ 22.) The omission of the fees to be paid to CJM is the entirety of the allegedly fraudulent acts made in connection with Griffin's initial purchase in CBR.

Griffin has adequately pled facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' within the intendment of [§ 78u-4(b)(2)] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.

> [T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [§ 78u-4(b)(2)] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Id.* In the present case, Griffin alleged that he initially invested in BRI and ICS based on the expectation that Jones's undivided loyalty was to BRI and ICS rather than to competing companies. (Am. Compl., DN 18, at ¶ 4.) Moreover, Griffin has alleged that Jones provided misleading financial statements, balance sheets, and sales figures on a regular basis, failing to disclose the funds directed to Defendants and the other entities associated with them. (*Id.* at 33-34.) Furthermore, Griffin has adequately alleged that Defendants failed to provide Griffin with information that they had a duty to disclose. "[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information that the other party is entitled to know

because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. U.S.*, 445 U.S. 222, 228 (1980) (internal quotation omitted). Because Jones and CJM owed fiduciary duties to Griffin, they may be liable for both omissions and misstatements. Finally, Griffin alleges numerous fraudulent activities, including that Defendants improperly diverted the companies' funds and inventory for their own benefit and that they were engaged in "chop-shop" operations in violation of copyright law. (Am. Compl., DN 18, ¶¶ 62-677, 68-74.)

"The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23. Scienter includes not only the "knowing and deliberate intent to manipulate, deceive, or defraud," but also recklessness. *See Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011). Recklessness means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it. *Id.* (quotation omitted). The allegations discussed above support the inference that Defendants were reckless in misstating the companies' finances and failing to provide Griffin with material information in an effort to induce his purchases of securities.

The Court finds that Griffin has demonstrated a "strong inference" that Jones acted with the requisite scienter at the time of Griffin's initial investment. Accordingly, Griffin has adequately stated a claim for securities fraud as it relates to this investment in ICS, BRI, SEB, and CBR.

**B. Griffin's subsequent contributions**

The Defendants seek dismissal of Griffin's securities fraud claim relating to his subsequent contribution to the companies on the grounds that the contributions do not constitute purchases of "securities."  Absent a purchase of securities, one cannot maintain a claim for securities fraud.

In the complaint, Griffin refers to his contributions to the companies between April 2009 and June 2012 as "lines of credit" and "wire transfers."  *See, e.g.,* Am. Compl. ¶¶ 20, 34, 36.  He also describes his contributions as "investments."  *See, e.g.*, *Id.* ¶¶ 20, 35, 36.  In all, Griffin alleges that the "lines of credit," "wire transfers," and "investments" were made in "securities."  (*Id.* ¶ 90.)  In his response brief, Griffin argues that even if these wire transfers are considered "loans" to CBR and SEB, they nonetheless qualify as purchases of securities because they are "notes."  (Pl.'s Resp., DN 23, p. 7.)

Under the definitions found in the Securities Exchange Act, "notes" are defined as "securities."  15 U.S.C. § 78c(a)(10) ("The term 'security' means any note . . . .").  But as interpreted by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 62-63 (1990), not every instrument labeled a "note" falls within the definition of "security" for the purpose of the Exchange Act.  The Defendants argue that Griffin fails to state a claim for securities fraud because the "notes" he allegedly purchased with his additional contributions are not the type of "notes" that fall within the Exchange Act's definition of "securities."  The Court disagrees and finds that the contributions are indeed "securities."

In *Reves*, the Supreme Court set forth the test for determining whether a "note" is a "security."  Known as the "family resemblance test," it begins "with the presumption that every note is a security."  *Reves*, 494 U.S. at 65.  The Court went on to recognize that

the presumption "cannot be irrebuttable." *Id.* A note is *not* a security if it bears a "family resemblance" to a list of notes that are not securities enumerated by the Court in *Reves*. Notes that are not securities include:

> [T]he note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business[.]

*Id.* (quoting *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976)).

The Court agreed with the Second Circuit that the foregoing list is not "graven in stone" and is "capable of expansion." *Id.* at 66. Here, the wire transfers that Griffin issued do not fall neatly into a category recognized in *Reves* so as to be excluded from consideration as securities. However, instruments labeled as notes can be found *not* to be securities if they bear "resemblance" to and share common characteristics of those on the enumerated list. *Id.* at 65.

Four factors must be examined to determine if the instruments so strongly resemble one of the enumerated categories that they nevertheless are *not* securities. First, the "motivations that would prompt a reasonable seller and buyer to enter into" the transaction must be examined. *Id.* at 66. Second, a court must consider any "plan of distribution" involving the note. *Id.* Third, consideration of the "reasonable expectations of the investing public" will aid in determining whether the note is a security. *Id.* Finally, courts must consider whether another factor, such as a regulatory scheme independent of the securities laws, "reduces risk in the instrument." *Id.* at 67. The

balance of these factors will determine whether the instrument at issue is a "note" within the definition of "security" found in the Exchange Act. Upon consideration and application of these factors, the Court finds that the additional contributions, wire transfers, lines of credit, and investments by Griffin most closely resemble those "notes" that constitute "securities." Each of the four factors is considered in the following analysis.

**1. Griffin's motivations for the transfers weigh in favor of considering them "securities."**

The Court first considers the motivations underlying Griffin's additional contributions to ICS, BRI, SEB, and CBR. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.* at 66. But "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a 'security.'" *Id.*

Griffin argues that his "primary purpose in making [the] wire transfers to Defendant was investment in the Companies with the expectation of generating profits." (Pl.'s Resp., DN 23, 8.) Accepting this purpose as true, the transfers are "notes" and therefore "securities." Although the transfers were made in response to Jones's request for additional funds to pay operating expenses and purchase inventory (Am. Compl., DN 18,¶ 35), Griffin's additional contributions were made with the expectation of generating profits, in addition to recouping his initial investments. This is akin to the factual circumstances of *Reves*, where a co-op sold notes to the general public "in an effort to

raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest." *Reves*, 494 U.S. at 67-69. Because the circumstances that prompted *Reves* to find that the notes were bought in expectation of profit are also present in this case, this factor weighs in favor of finding that the "notes" are "securities."

Defendants assert that the transactions were made to correct the companies' cash flow difficulties rather than to seek a profit. They therefore conclude that the notes are not properly described as "securities." However, it is "the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security)." *S.E.C. v. Mulholland*, 2013 WL 979423 at *4 (E.D. Mich., Mar. 13, 2013) (quoting *S.E.C. v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995)). Although Defendants maintain that Griffin's transfers were used to remedy the companies' cash flow, the Amended Complaint alleges that Defendants told Griffin that they would use his funds to repay the amounts he had already invested and to generate new business. (Pl. Am. Compl. ¶¶ 20, 43.) Griffin's primary motivation was monetary gain, as was the case in *Reves*. Under the *Reves* framework, this factor supports the conclusion that the transactions were "securities."

**2. No "plan of distribution" existed involving the notes, counseling against considering them "securities."**

Second, to determine whether Griffin's contributions were notes, the Court considers any "plan of distribution" involving the notes. *Id.* at 66. When conducting this examination, the Court should look to "determine whether it is an instrument in which there is 'common trading for speculation or investment." *Id.* (citing *SEC v. C.M. Joiner*

*Leasing Corp.*, 320 U.S. 344 (1943)).  "This factor has historically been problematic in application."   *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 585 (6th Cir. 2000) (noting that an arrangement negotiated one-on-one by the parties has been held not to be a security, but paradigmatic securities, such as stocks, can be offered and sold to a single person while remaining securities).

In the present case, Griffin makes no allegations of a plan to distribute the alleged notes to a "broad segment of the public," and neither were they traded on an exchange. *Reves,* 494 U.S. at 68.  This factor counsels against construing the would-be notes as "securities."   However, this factor is not fatal to Griffin's claim, and the Court will consider the test's remaining factors.

### 3.   The reasonable expectations of the both the parties and of the public weigh in favor of considering the notes "securities."

Third, the Court considers the "reasonable expectations of the investing public" and will consider instruments to be "securities" on this basis even "where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction."  *Reves*, 494 U.S. at 66.  The "fundamental essence" of a security is its character as an "investment."  *Id.* at 69. Reasonable public expectations will govern an instrument's characterization; this analysis requires considereation of "the reasonable expectation of the public who invested, and whether they would make money through investing.'"  *Mulholland*, 2013 WL 979423 at *6 (E.D. Mich., Mar. 13, 2013) (internal quotations omitted).  Taking Griffin's factual allegations as true, Griffin conceived of the transactions as "investments" by which he sought to secure a return.

Although Defendant argues that the transactions are properly characterized as loans rather than securities, *Reves* held that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called. *Reves*, 494 U.S. at 61 (emphasis in original). Because Griffin invested money expecting to get more in return, the third *Reves* factor is satisfied.

**4. No independent regulatory scheme would otherwise govern the notes.**

Finally, the Court examines whether another factor, such as a regulatory scheme independent of the Securities Acts, significantly reduces the instrument's risk so as to make application of the Securities Acts unnecessary. *Reves*, 494 U.S. at 66. "This factor factors Defendants only if they can demonstrate there is a scheme of regulation involved that substantially eliminates the investors' investment risk, and thus renders unnecessary the protections provided by the securities laws." *Mulholland*, 2013 WL 979423 at *7 (E.D. Mich., Mar 13, 2013) (internal quotations omitted). The notes, like those in *Reves*, are apparently uncollateralized and uninsured. *Reves*, 494 U.S. at 69. Were the Securities Acts not to apply, the notes would avoid federal regulation. *See id.* Therefore, this factor counsels in favor of considering the notes to be "securities."

According to the "family resemblance" test, a note is a presumed to be a "security," and this presumption is rebutted only by a showing that the note bears a strong resemblance, in terms of the four factors discussed above, to one of the enumerated categories of instruments. Griffin's transfers survive the *Reves* analysis and are therefore properly construed as securities within the meaning of the Exchange Act and its accompanying regulations. Therefore, the Defendants' Motion to Dismiss must be denied as to the federal securities claims.

**II. The Court retains supplemental jurisdiction over the remaining claims as part of the same case and controversy.**

Because the Court properly exercises jurisdiction over Griffin's federal law claims, it may exercise supplemental jurisdiction over the remaining state law claims because they so relate to the federal claims as to form the same case and controversy. 28 U.S.C. § 1367. Griffin has sufficiently stated these claims as to survive Defendants' Motion to Dismiss.

**A. Breach of fiduciary duties**

Griffin alleges that Jones, as an officer, member, and/or director, owed statutory and common law duties of care and loyalty to BRI, ICS, and to Griffin personally as an investor and creditor. (Am. Compl., DN 18, ¶ 95.) Griffin further alleges that as a manger of BRI and ICS, CJM owed statutory and common law duties of care and loyalty to the companies and to Griffin. Finally, Griffin alleges that CJM, as manager of SEB and CBR, owed statutory and common law duties of care and loyalty to Griffin in his capacity as an investor and creditor. (*Id.*)

Both BRI and SEB are Kentucky limited liability companies. CBR is a Wyoming Limited Liability Company. In support of his claims for breach of fiduciary duties, Griffin points to statutory duties discussed in the Kentucky Limited Liability Company Act, KRS 275.001 *et seq.*; the Kentucky Business Corporation Act, KRS 271B.1-010 *et seq.*; and the Wyoming Limited Liability Company Act, W.S. 1977 § 17-29-101 *et seq.*

BRI is a manager-managed LLC, of which Griffin and Jones are 50-50 members; it is managed by CJM. (Am. Compl., DN 18, ¶ 18, 26.) Kentucky courts have held that a member of a limited liability company owes a duty of loyalty to fellow members and the

company. *Patmon v. Hobbs*, 280 S.W.3d 589 (Ky. Ct. App. 2009). *Patmon* held that "a partner has a duty to share with the partnership those business opportunities clearly related to the subject of its operations." *Id.* at 594. Just as partners owe good faith to each other, so too do members of limited liability companies. *Id.* at 595. *Patmon* remains valid law; *see Pixler v. Huff*, Case No. 3:11-cv-00207-JHM, Mem. at 20 (W.D. Ky. July 30, 2012) ("In Kentucky, managers and members of an LLC owe a fiduciary duty to one another.") (citing *Patmon*, 280 S.W.3d).

The same analysis applies to the allegations of breach of fiduciary duty related to ICS, a Kentucky corporation of which Griffin and Jones are 50-50 shareholders and directors. KRS § 271b.2-020(d) explains that entities may limit or eliminate "the personal liability of a director to the corporation *or its shareholders* for monetary damages for breach of his duties as a director . . . ." It stands to reason, then, that in the absence of such limitation or elimination, directors owe duties to companies and their shareholders. *See Brewer v. Lincoln Int'l Corp.*, 148 F. Supp. 2d. 792, 813 (W.D. Ky. 2000) (explaining that Kentucky law requires corporate officers and directors "to act in good faith, on an informed basis, and in a manner [they] honestly believe[] to be in the best interests of the corporation.").

Further, CJM owed fiduciary duties of loyalty to the members of the companies it managed. Kentucky law holds that an LLC's manager owes a duty of loyalty to its members. *Patmon v. Hobbs*, 280 S.W.3d 589, 595 (Ky. Ct. App. 2009). "The [fiduciary] relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing confidence."

*Id.* at 593 (quoting *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)). A breach of loyalty claim is based on the fiduciary duty between principals and agents. In manager-managed LLCs, "every manager is an agent of the limited liability company for the purpose of its business or affairs." *Id.* at 594 (citing KRS 275.135(2)(b)). Consequently, CJM was bound to act not only in the interests of the companies, but also owed them a basic duty of faithfulness and loyalty. *Id.* at 594. The duties of faithfulness and loyalty extend to

A similar duty applies to the management of SEB, as Wyoming law imposes similar duties of loyalty and care upon members of member-managed LLCs. Members owe fiduciary duties both to the company and to their fellow members. The law requires a manger to act with the care that one in a like position would reasonably exercise under like circumstances and in a manner that he reasonably believes to be the in best interests, or at least not opposed to the best interests, of the company. W.S. § 17-29-409(c) and (g)(i). A member may bring a direct action against another member or manager for violations of such duties. W.S. § 17-29-901. ("[A] member may maintain a direct action against another member, a manger or the limited liability company to enforce the member's rights and otherwise protect the member's interests, including rights and interests under the operating agreement or this chapter or arising independently of the membership relationship.").

Griffin alleges that Jones, both individually and by delegating manger duties to CJM, acted contrary to the company's best interests. Taking Griffin's allegations as true, the Court finds that Griffin has adequately stated claims for breach of the duty of care as to Jones and CJM.

## 2. Directors owe fiduciary duties to the shareholders of their companies.

K.R.S. § 271b.2-020(d) explains that entities may limit or eliminate "the personal liability of a director to the corporation *or its shareholders* for monetary damages for breach of his duties as a director . . . ." It stands to reason, then, that in the absence of such limitation or elimination, directors owe duties to companies and their shareholders. *See Brewer v. Lincoln Int'l Corp.*, 148 F. Supp. 2d. 792, 813 (W.D. Ky. 2000) (explaining that Kentucky law requires corporate officers and directors "to act in good faith, on an informed basis, and in a manner [they] honestly believe[] to be in the best interests of the corporation.").

## 3. Griffin may properly raise the fiduciary duties owed by Defendants.

As discussed *supra*, Jones and CJM owed fiduciary duties to the members of BRI, SEB, and CBR. Accordingly, Griffin, a member of BRI, has adequately stated a claim as to this entity. However, as discussed above, Griffin purchased and held SEB and CBR securities by way of his transferring funds. Furthermore, courts have held that fiduciary duties owed by directors of wholly owned subsidiaries run to a parent and its shareholders or members. *See, e.g.*, *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988). If a plaintiff stockholder of the parent company pleads particularized facts explaining how the directors of a wholly owned subsidiary breached their duty of loyalty, he may raise a duty of loyalty claim. *Hamilton Partners, L.P. V. Englard*, 11 A.3d 1180, 1208-1210 (Del. Ch. 2010).

## B. Fraud

Griffin argues that Jones and CJM made to him material misrepresentations of fact and concealed material facts from him regarding the operations, financial status, and expenses of the companies with the intent to defraud him.  (Am. Compl., DN 18, ¶ 99.) He further argues that Jones and CJM shifted the companies' assets to entities within their control exclusively for Jones's personal use and gain.  (*Id.*)  Griffin argues that three of Jones's various positions confer him with a duty to provide Griffin with material facts. First, he points to Jones's status as an officer of ICS and CJM; next, he points to Jones's status as a member of BRI and Chief Executive Officer of CJM; finally, he points to Jones's status and that of CJM as managers of the companies.  (*Id.*)

Griffin has pleaded claims alleging both fraud by misrepresentation and fraud b omission claims.   Rule 9(b) requires a complaint alleging fraud "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Trust Co. v. Bear Stearns Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted).  Griffin has satisfied these requirements in his Complaint; *see* Am. Compl., DN 18, ¶¶ 20, 32-35, 38, 43-44, 52, 58, & 82.  Taking Griffin's allegations as true, he has adequately stated a claim for fraud by misrepresentation.

Furthermore, Griffin's claim for fraud by omission withstands Defendant's motion.  "[A] fraud by omission claim is grounded in a duty to disclose.  To prevail, a plaintiff must prove:  (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence."  *Giddings*, 348 S.W.3d at 747 (citations omitted).  A duty to disclose may

arise where a fiduciary relationship binds the parties, where a statute imposes such a duty, or where a defendant has partially disclosed material facts but created the impression that he fully disclosed them. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003).

Because the Amended Complaint alleges facts sufficient to ascertain the Defendants' fiduciary duties to Griffin, the first element is satisfied. The Amended Complaint also satisfies the second element by alleging that the Defendants withheld and failed to disclose material facts to Griffin. Finally, Griffin alleges that the Defendants' omissions induced him to act, resulting in actual damages. Therefore, the Amendment Complaint's allegations sufficiently state a claim for fraud by omission.

## C. Misappropriation

Griffin next argues that the Joneses, CJM, Global Book, and as-yet unnamed entities misappropriated the assets that Griffin provided "in order to increase the value of [his] investments" for their own benefit. (*Id.* ¶ 107-109). Griffin further argues that TAI misappropriated ICS's assets, decreasing the value of Griffin's ownership in ICS. Although such claims are typically raised as derivative actions, Kentucky courts have permitted shareholders to sue other shareholders for misappropriation when material disputed facts exist as to whether the co-owners utilized corporate assets for their personal gain. *See, e.g., Lowder v. Lowder*, 2008 WL 1757529 (Ky. App. Mar. 11, 2009).

Griffin's Amended Complaint alleges that Griffin provided funds and bought securities in the companies that Defendants operated. He further alleges that Defendants misappropriated funds from these purchases for their own personal benefit. Taking

Griffin's allegations as true, he adequately states a claim of misappropriation against Defendants.

**D. Unjust Enrichment**

Griffin alleges that the Joneses' and CJM's "false and misleading statements and omissions" caused him to transfer money to the companies. He further argues that this money was ultimately used in furtherance of the fraudulent schemes of the Joneses and the various entities they operated. (Am. Compl., DN 18, ¶ 111-117.) Griffin argues that the Joneses and the associated entities were unjustly enriched by obtaining funds from Griffin by fraud, and that TAI was unjustly enriched by accepting money owed to ICS by its customers.

Defendants note that Defendants allegedly took money from the companies rather than from Griffin personally. (DN 14-1 at 34). However, Kentucky law provides that "[f]or a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 279 S.W.3d 73, 78 (Ky. App. 2009). Here, Griffin provided funds for the benefit of the companies at issue, not for the Defendants. Griffin's allegation that Defendants wrongfully withdrew money from the companies for their own benefit and at Griffin's expense sufficiently states a claim for unjust enrichment.

**E. Constructive Trust**

Griffin urges the Court to find that because his funds were fraudulently obtained, they are held in constructive trust on his behalf and he is entitled to their recovery. ((Am. Compl., DN 18, ¶ 1118-123.) Griffin's pleading of the basis for this equitable remedy is sufficient to withstand Defendants' Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED as to the above claims.