UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00163

DAVID GRIFFIN                                                                                    Plaintiff,

v.

CHARLES A. JONES, *et al.*                                                                  Defendants.


**MEMORANDUM OPINION**

This matter comes before the Court upon several Motions to Dismiss filed by Counterclaim Defendant David Griffin and Third-Party Defendants John Farris, Commonwealth Economics, LLC, John Wittman, and Joe Pat Cohoon (collectively, "the Defendants"). (Docket Nos. 49, 56, 61, and 63.) Fully briefed, these matters are ripe for adjudication. The Court will consider each Motion in turn.

**Factual Background**

This matter concerns the Counterclaim raised by Jones, which asserts that Defendants violated Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act and various state law claims. (Docket No. 44.) As required when deciding a motion to dismiss, the Court presumes that the counterclaim's allegations are true. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). Taking them as true, the relevant facts are as follows.

This action arises from a soured business relationship between David Griffin and Charles Jones. Jones founded a number of businesses, several of which have allegedly become extraordinarily successful and some of which are at the heart of this lawsuit. In June 2008, Jones formed CA Jones Management Group, LLC, ("CAJM"), to manage some of these companies. The Third-Party Defendants include John Farris, a principal of Commonwealth Economics, LLC ("Commonwealth"), a business advisory and consulting firm; Commonwealth itself; John Wittman, an employee of CAJM, who served as vice-

president of College Book Rental Company, LLC ("CBR"); and Joe Pat Cohoon, a former contractor for CAJM.

Griffin became involved in several of these businesses in 2008, first purchasing a fifty percent interest in Integrated Computer Solutions, Inc., ("ICS"). Griffin and Jones formed Blackrock Investments, LLC, ("Blackrock"), as a holding company for their investments. In July 2008, Blackrock formed a subsidiary, SE Book Company, LLC, ("SE Book"), for the purpose of acquiring a textbook company in Murray, Kentucky. Although SE Book was initially wholly owned and managed by Blackrock, its operating agreement was amended in July 2008 to add ICS as a member. In March 2009, CBR was formed; later, CAJM was installed as the manager of both SE Book and CBR. With Griffin serving as the "chairman of the board of directors" of CBR, he and Jones spoke regularly about the financial outlook for Blackrock, ICS, SE Book, and CBR (collectively, "the Joint Companies").

Jones asserts that in light of the Joint Companies' success, in April 2010, Griffin sought to alter the parties' agreement such that Griffin would own 90% of the Joint Companies. In September 2011, Farris, a business adviser with Commonwealth, valued CBR between $191 and $319 million to Metropolitan Life Insurance Company in an effort to secure various loans. (Docket No. 44 at 18.) Jones alleges that Griffin and Farris falsely represented the portion of the Joint Companies that Griffin owned, exaggerating his ownership stake. (Docket No. 44 at 18.) In the same month, Griffin allegedly confronted Jones, threatening that if Jones failed to cede 90% of the equity in CBR, Griffin would destroy both the business and Jones himself. When Jones refused, Griffin caused CBR, SE Book, and Blackrock to transfer $1.7 million to Griffin; in December 2011, Griffin forced an additional $1,070,000 transfer. In Jones's telling, these funds had been loaned to the Joint Companies to finance their continued operation and expansion.

Jones further alleges that in October 2011, Griffin and Farris "forced" him to agree to forfeit half of his interest in CBR, with no consideration paid, leaving Griffin with 75% ownership of the company. This agreement, however, was ultimately revoked.

In February 2012, Griffin sued Jones, CAJM, and Jones's wife, Sarah, in this Court. (*See Griffin v. Jones*, Civil Action No. 5:12-cv-00033-TBR.) He also sued the Joint Companies. Jones alleges that this litigation played into Griffin's scheme to make the Joint Companies impossible to either operate or sell, leaving banks and buyers alike reluctant to do business with them. As a result, the once-successful businesses struggled. In August 2012, Griffin dismissed his February 2012 lawsuit, having agreed with Jones that Myles MacDonald, a neutral third-party, would be installed as receiver to operate the Joint Companies. Jones alleges that the Defendants gave MacDonald false information in an effort to harm Jones. (Docket No. 44 at 20.) Jones further contends that the Defendants offered false information to law enforcement personnel and prosecutors in an effort to convince them to prosecute Jones. (Docket No. 44 at 20.)

Jones contends that in July 2012, Griffin persuaded both Security Bank and Planters Bank to alter their agreements with the companies at issue to the companies' detriment. (Docket No. 44 at 20.) Jones further claims that Griffin caused an involuntary bankruptcy petition to be filed against CBR on October 4, 2012, "falsely claiming that Griffin had loaned CBR $15,000,000 although he had in other legal pleadings claimed that these funds had been used to purchase his equity interest in the Joint Companies." (Docket No. 44 at 20.)

Finally, Jones points to a series of allegedly vexatious lawsuits that Griffin brought or joined against Jones, members of the Jones family, the Joint Companies, and/or other businesses owned by Jones. (Docket No. 44 at 21-22.) Jones urges that Griffin levied these lawsuits as part of a "racketeering scheme to punish Jones for failing to agree to turn over his interest in CBR, to deprive him of that interest, and to drain him of assets" to prevent him from either operating competing businesses or defending the lawsuits. (Docket No. 44 at 22.) Jones alleges that Griffin knowingly or recklessly included a number of false and misleading allegations in the Complaints and other docket filings. (Docket No. 44 at 22-23.)

## Legal Standard

The Federal Rules of Civil Procedure require that pleadings, including complaints, contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint may be attacked for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court will presume that all the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the nonmoving party. *Total Benefits,* 552 F.3d at 434 (citing *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted). Instead, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). That is, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). If from the well-pleaded facts the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Analysis

I.   **Because Jones has failed to adequately allege a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), this claim will be dismissed.**

On October 25, 2013, Jones commenced a civil action pursuant to Section 1964(c) of RICO, which authorizes a civil cause of action for any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962.  18 U.S.C. §§ 1961 *et seq.*  Section 1962 provides a list of prohibited "racketeering activities."  Jones relies upon § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Therefore, to allege a violation of the statute, Jones must point to "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  Jones contends that Defendants violated the Hobbs Act and committed wire fraud in an effort to deprive Jones of his ownership interest in the Joint Companies, to retaliate against him for objecting to Griffin's scheme, and to deprive him of their honest services.  (Docket No. 44 at 24.)

A.   **Jones has not adequately alleged any predicate acts of racketeering activity.**

Racketeering activity consists of acts deemed indictable under a number of federal statutes enumerated in 18 U.S.C. §1961(1)(B).  Here, Jones alleges predicate acts of racketeering activity consisting of wire fraud, 18 U.S.C. § 1343, and violation of the Hobbs Act, 18 U.S.C. § 1951.  To allege a valid RICO claim, a plaintiff must show not only that the predicate act was a "but for" cause of his injuries, but also a proximate cause.  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  He must demonstrate "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*  The Court will consider each of the alleged predicate acts below.

Wire fraud consists of "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property."

*United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000) (footnote omitted). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). A plaintiff alleging wire fraud must also demonstrate scienter—that is, a showing that the defendant acted with either a specific intent to defraud or with recklessness with respect to potentially misleading information. *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).

Jones must also satisfy the more rigorous pleading standards of Rule 9(b) with regard to his claims based on fraud. According to Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why such statements were fraudulent.'" *Heinrich*, 668 F.3d 3at 404 (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

Jones fails to plead the predicate act of wire fraud with the particularity demanded by Rule 9(b). "Where a plaintiff makes only 'loose references' to support its allegations of . . . wire fraud, but otherwise fails to identify the parties to those transactions, circuit courts have upheld the dismissal of the RICO claims under both Rule 9(b) and RICO itself." *Tunne v. Hendrick*, 2012 WL 3644825, at *13 (W.D. Ky. Aug. 24, 2012) (quotation omitted); *see also Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("[W]ithout an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established.").

Jones points to the "electronic transmission from Tennessee to Kentucky" of four documents, two of which were complaints, one an affidavit of Third-Party Defendant Farris, and one an involuntary bankruptcy petition. (Docket No. 44 at 27-28.) It appears that the "electronic transmissions" at issue refer to filings made through the Court's CM/ECF system. Jones provides the case numbers associated with the two complaints—"Racketeering Act No. 2" arising in Docket No. 5:12-cv-00033-TBR and

"Racketeering Act No. 5" arising in Docket No. 5:12-cv-00163-TBR—and the affidavit, Docket No. 5:12-cv-00163-TBR, arising in "Racketeering Act No. 3." (Docket No. 44 at 27-28.) However, he does not identify the case number or debtor entity associated with the involuntary bankruptcy petition identified as "Racketeering Act No. 4." (*See* Docket No. 44 at 28.)

Griffin argues that each of the four documents to which Jones points was transmitted only intrastate. (Docket No. 49-1 at 8.) The Court agrees. Even a cursory glance at the docket establishes that the documents identified in what Jones labels as Acts No. 2, 3, and 5 were filed by attorney Charles M. Pritchett, Jr., in Louisville, Kentucky. (*See Griffin v. Jones*, 5:12-cv-00033-TBR, Docket Nos. 1, 6; 5:12-cv-00163, Docket No. 1.) Furthermore, Act No. 4—the involuntary bankruptcy petition filed for CBR—was filed in the United States Bankruptcy Court for the Middle District of Tennessee by attorney Joseph A. Kelly of Nashville, Tennessee. (*See In re College Book Rental Co., LLC*, 3:12-BK-09130, Docket No. 1.) Accordingly, these filings cannot satisfy the interstate requirement contemplated by the statute. This jurisdictional flaw renders Jones unable to rely upon wire fraud as a predicate act.

Jones responds that Griffin's argument must fail at the motion to dismiss stage, as Griffin cannot demonstrate that the transmissions originating in one state did not pass through another before reaching their destination. (Docket No. 58 at 7.) However, district courts have often noted that such general allegations concerning intrastate wire communications do not give rise to the predicate act of wire fraud. *See, e.g.*, *Tallely v. Halpern ex del Estate of Winderman*, 2005 WL 2002611, at *4 (E.D. Penn. Aug. 16, 2005); *In re Med. Educ. & Health Servs., Inc.*, 459 B.R. 527 (D. P.R. Sept. 2, 2011) (explaining that "an essential element of the federal fraud statute is the use of interstate communication lines" and thus dismissing the claim of a plaintiff who failed to allege that the wire communications at issue crossed state lines). Because Jones has not plausibly pled that the relevant transmissions crossed state lines, his claim cannot stand.

Jones also fails to allege that the four pleadings mentioned above constituted part of a "scheme to defraud" or were causally related to the damages he seeks. Taking the allegations of Jones's Counterclaim at face value, he has alleged that Griffin openly sought to acquire Jones's interests in the

Joint Companies; however, he has pointed to no "false, deceptive, or fraudulent pretenses, representations or promises." Although he alleges eight misstatements of fact in four court filings, (Docket No. 44 at 22), he fails to adequately allege that these statements caused the damages he claims as a result of his lost stake in CBR. This deficit renders his claim inadequate. *See Heinrich*, 668 F.3d at 405 ("'A plaintiff must show 'some direct relation between the injury asserted and the injurious conduct alleged.'") (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see also Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 848 (N.D. Ill. 2013) (explaining that "filing and prosecuting a complaint is not considered mail or wire fraud or a predicate act under RICO."). As Griffin notes, the logical extension of this argument would lead to absurd results (and a crowded federal court docket): ordinary business disputes would transform dramatically into RICO violations, simply because a party transmitted an electronic filing across state lines.

Furthermore, the Court rejects Jones's attempt to rely upon theft of honest services as the required scheme to defraud. 18 U.S.C. § 1346, entitled Definition of Scheme or Artifice to Defraud, explains that "For the purposes of this chapter [Title 18 U.S.C. Part I — Crimes, Chapter 63 — Mail Fraud and Other Fraud Offenses], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." The "honest services doctrine" expanded the mail fraud statute to include deprivations of not just money or property, but also of intangible rights. *See, e.g.*, *Shushan v. United States*, 117 F.2d 110 (1941). "Most often these cases involved bribery of public officials, but over time, the courts increasingly recognized that the doctrine applied to a private employee who breached his allegiance to his employer, often by accepting bribes or kickbacks." *Skilling v. United States*, 561 U.S. 358, 363-64 (2010).

In *Skilling*, the Supreme Court considered the doctrine's scope and concluded that Congress certainly intended § 1346 to reach at least bribes and kickbacks. But the Court also limited § 1346's reach to include only crimes encompassing this "bribe-and-kickback core." *Id.* at 364. The Court rejected the Government's suggestion that § 1346 also prohibited undisclosed self-dealing by either a public official or a private employee. Although Jeffrey Skilling, the infamous Enron executive, was charged with conspiring to defraud shareholders in an effort to maximize his own profit, the Government did not allege

that he accepted bribes or kickbacks in exchange for doing so. Given the absence of third-party involvement, the Court found the Government's allegation of "theft of honest services" lacking.

*Skilling* requires the same result here. Although Jones claims that the "scheme to defraud" was intended to deprive him of Griffin's honest services, he points to no contention that Griffin received bribes or kickbacks throughout the parties' rocky relationship. Consequently, Jones's claim for theft of Griffin's honest services cannot survive to establish a predicate act of wire fraud.

Jones next claims that the Defendants engaged in extortion in violation of 18 U.S.C. § 1951. Known as the Hobbs Act, this statute provides that

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

§ 1951(a). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). As the Sixth Circuit has explained, the statute contemplates not only fear of physical violence, but also fear of economic harm: "[A] private citizen can commit extortion by leading the victim to believe that the perpetrator can exercise his or her power to the victim's economic detriment." *Heinrich*, 668 F.3d at 407. To claim acts of extortion in such cases, a plaintiff must allege facts that show (1) that the defendants obtained the plaintiff's property (2) through the wrongful use of (3) threats or fear of economic harm. *Id.*

As sister district courts in the Sixth Circuit have noted, a plaintiff must make factual allegations to support his allegations concerning predicate acts: "conclusory legal assertions do not adequately plead a RICO claim." *Mann v. Compton*, 2007 WL 854725, at *3 (E.D. Ky. Mar. 16, 2007) (citing *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) ("[I]n pleading predicate acts conclusory allegations that various statutory provisions have been breached are of no consequence if unsupported by proper factual allegations.")). Here, Jones states that in September 2011, Griffin "executed this crime by threatening Jones that if he did not agree to give Griffin 90% of the interest in CBR, Griffin would destroy the

business and take it for himself." (Docket No. 44 at 27.) No other information concerning the threat is provided, including the damages that Jones allegedly suffered as a result. Moreover, Jones claims that in October 2011, Farris and Griffin "forced" him to "agree to give up half of his interest in CBR for no consideration." (Docket No. 44 at 19.) However, he provides no explanation of how these two Defendants effectuated this forced forfeiture—and in the same breath, he states that that agreement was revoked, thus maintaining the evenly-split ownership interest. (Docket No. 44 at 19.)

What is more, there is no allegation that Jones was wrongfully "forced" to give up his interest in CBR or that any such plan shared a causal relationship to Griffin's alleged threat to destroy CBR. Instead, the Defendants' alleged plan "to take what rightfully belonged to Jones," (Docket No. 58 at 10), emerged only *after* the purported threat. Jones himself acknowledges this sequencing. (*See* Docket No. 44 at 19 ("Angered by the refusal, Griffin then launched a plan to squeeze Jones out of the business interests he would not voluntarily give up and buy those businesses for himself.").) Because the threat predated the plan, no causal relationship can exist between the two.

The Court further notes that a threat of litigation does not constitute extortion. *Sweden AB v. Innovatech Prods. & Equip. Co.*, 2008 WL 4510710 (E.D. Tenn. Sept. 30, 2008) ("Threats of litigation, even meritless litigation, do not constitute extortion under the Hobbs Act." (citing *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994)). Given the Sixth Circuit's admonition in *Vemvo* that such threats do not constitute predicate acts, the Court finds that Jones fails to allege any predicate acts necessary for a violation of RICO. To the extent that Jones alleges that the threatened and actual litigation supports a claim of extortion, the Court rejects this argument.

**B.     Griffin argues that Jones has failed to adequately allege that the purported acts formed a pattern of sufficient continuity.**

Had Jones properly alleged the requisite predicate acts under RICO, his claim would nonetheless fail, as he has failed to allege that any such acts constituted a pattern of racketeering activity. 18 U.S.C. § 1962(c) requires a plaintiff alleging a RICO violation to demonstrate "a pattern of racketeering activity." To show such a pattern, the plaintiff must point to two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). What is more, the plaintiff must show "'that the racketeering

predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Heinrich*, 668 F.3d at 409 (quoting *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)). Courts refer to this requirement as the "relationship plus continuity" test. *Id.* (citing *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 355 (6th Cir. 2008)).

Jones fails to satisfy the test's "continuity" prong. A plaintiff may fulfill the continuity requirement by showing either a "close-ended" or an "open-ended pattern." *Id.* A "close-ended" pattern refers to "a series of related predicate acts extending over a substantial period of time." *Id.* However, "'[p]redicate acts extending over a few weeks or months . . . do not satisfy this [close-ended] continuity requirement.'" *Id.* (quoting *H.J., Inc.*, 492 U.S. at 242). The Sixth Circuit has found that racketeering activity spanning seventeen months did not constitute a substantial period of time. *See Vemco*, 23 F.3d at 134 (finding that allegations of four predicate acts spanning seventeen months were insufficient to meet the continuity requirement). Here, Jones alleges that the predicate acts of racketeering activity spanned approximately fourteen months. Consequently, they fail to meet the requirements for close-ended continuity.

Nor does Jones demonstrate an "open-ended pattern"—that is, "a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed." *Heinrich*, 668 F.3d at 409-10. In such cases, the plaintiff must plausibly allege a threat of ongoing criminal activity, extending beyond the period during which the predicate acts were performed. *Id.* The scheme that Jones alleges was "an inherently short-term affair." *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 741 (W.D. Ky. 2013). Had the Defendants' alleged scheme reached a successful end, it would have necessarily concluded once Jones no longer held a controlling interest in the Joint Companies. This "necessarily terminable scheme" shares the characteristics of others in which the Sixth Circuit has found no open-ended continuity. *See, e.g.*, *id.*; *Vemco*, 23 F.3d at 134 (discussed *supra*); *Thompson v. Paasche*, 950 F.2d 306 (6th Cir. 1991) (characterizing the defendant's scheme as "an inherently short-term affair" when he sold all of the lots at issue, rendering the scheme "insufficiently protracted to qualify as a RICO violation.").

Attempting to save his claim, Jones points to three October 2013 lawsuits as evidence that the alleged pattern of racketeering endures to this day. However, Jones does not claim that these lawsuits contain misstatements about himself or his businesses, or more generally, that the lawsuits are otherwise improper. The ongoing nature of the lawsuits between the parties cannot serve as the basis for open-ended continuity. Although the lawsuits likely cost Jones a great deal of expense, inconvenience, and uncertainty, the Court finds nothing improper in the parties' engagement with the legal process.

C.   **Jones has failed to adequately allege that the Defendants formed a RICO enterprise.**

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Jones alleges that the Defendants created an association-in-fact enterprise. (Docket No. 44 at 24.) To establish the existence of an "enterprise," a plaintiff must demonstrate: "(1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) (citing *United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002).

The Supreme Court has explained that an association-in-fact enterprise requires three structural features: "'a purpose, relationships among those associated with the enterprise, and longevity sufficient o permit these associates to pursue the enterprise's purpose.'" *Id.* (quoting *Boyle v. United States*, 694 F.3d 783, 794 (6th Cir. 2012)). Such an enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *Id.* (quotation omitted). But this structure can be an informal one, without official hierarchy or a formal procedure for making decisions; instead, a plaintiff must show "'simply a continuing unit that functions with a common purpose.'" *Id.* (quoting *Boyle*, 556 U.S. at 948).

Jones's RICO claim includes no specific allegations of the framework or structure in the relationship between the Defendants. Rather, he alleges at most that the Defendants alleged in a simple

conspiracy to remove Jones from his controlling position over the Joint Companies. In response, Jones points to four separate purposes of the enterprise: to wrongfully deprive Jones of his interest in the Joint Companies and acquire it for Griffin; to retaliate against Jones for objecting to the Defendants' scheme; to eliminate Jones as a competitor for the Defendants' new business; and to deprive him of the Defendants' honest services. (Docket No. 58 at 14.) As explained above, Jones's honest services claim cannot withstand the motion to dismiss. The three remaining purposes do not reveal a purpose unrelated to the alleged scheme; instead, each concerns Defendants' scheme to divest Jones of his interest in the Joint Companies. Because Jones has not adequately pled the existence of a RICO enterprise separate from an underlying alleged pattern of activity.

In light of the above analysis of Jones's defective RICO claim, the Court will dismiss this cause of action in the instant case. The Court enjoys broad discretion in deciding whether to retain jurisdiction over the remaining state law claims. *Pinney Dock & Transp. Co. v. Penn Central Corp.*, 196 F.3d 617, 620 (6th Cir. 1999). The Court's decision to exercise such discretion hinges upon "judicial economic, convenience, fairness and comity." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). This case has remained upon the Court's docket for a considerable amount of time, and the remaining state law claims are no doubt entwined with the federal action. Therefore, the balance of considerations points toward retaining supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). The Court will discuss these claims below.

## II. Jones has not properly stated a claim for breach of fiduciary duty.

The Kentucky Supreme Court has explained that generally, a fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another." *Steelvest, Inc. v. Scansteel Serv. Cntr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). The relationship must also involve "an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *id.* To prevail upon a claim for breach of fiduciary duty, a plaintiff must demonstrate: (1) that the defendant owes a fiduciary duty to the plaintiff; (2) that the defendant

breached that duty; and (3) that the plaintiff suffered damages as a result of the breach. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 665 (E.D. Ky. 2009).

Jones's Counterclaim states, "As employees or contractors of Jones, Farris, Wittman, and Cohoon owed common law duties of care and loyalty to Jones." (Docket No. 44 at 29.) Jones alleges that the Defendants either wantonly or recklessly breached those duties. The Court notes that Jones has offered few details regarding the nature of the Third-Party Defendants' relationship to Jones or the companies. For example, the Counterclaim is silent as to the type of work that Cohoon contracted to do on behalf of the companies, and it fails to indicate the dates of Cohoon's engagement with the companies. Furthermore, Jones states only that Wittman breached his fiduciary duty "by engaging in the conduct described herein." (Docket No. 44 at 29.) The Counterclaim provides two paragraphs alleged "upon information and belief." It further asserts that Wittman caused an involuntary bankruptcy petition containing allegedly false statements to be filed and "created or contributed to creating the plan to divest Jones of his interest, and for which he was to receive stock in Griffin's new company."

The allegations regarding the involuntary bankruptcy petition cannot survive. The petition was filed not against Jones, but against CBR; Jones fails to explain how this filing breached a duty to him individually. Moreover, the filing of such a lawsuit does not constitute a breach of fiduciary duty. *See, e.g.*, *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 29, 36-38 (D.D.C. 2010) ("A trustee may file a lawsuit against a corporation in order to protect his own interests without breaching his fiduciary duty.").

But even had Jones provided sufficient detail to allege such claims, his Counterclaim would nonetheless suffer a fatal flaw: the Third-Party Defendants were not employees of Jones himself, but of the various companies at issue. Therefore, any duty owed by them was to the companies, not to Jones personally. Jones has not alleged that any of the Third-Party Defendants breached a duty to the companies, nor has he raised a derivative suit on behalf of them. He points to no facts suggesting that the Third-Party Defendants owed him fiduciary duties of loyalty and care.

Jones offers no response to this reality. Instead, in an effort to save his claims, Jones suggests that one who is not a fiduciary may nonetheless be liable for aiding and abetting a breach of fiduciary duty. (Docket No. 64 at 19-20.) However, Jones raises this claim for the first time in his response brief, (Docket No. 64 at 19-20), having failed to raise it in his Counterclaim. Whatever the merits of this new theory of liability may be, they were not properly raised in the original pleading and will not be considered for purposes of the instant analysis.

### III. Jones's claim for intentional interference with business relations may go forward.

Under Kentucky law, liability for the tort of intentional interference with business relations arises when a party improperly interferes with a business expectancy. *See NCAA v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1998). In *Hornung*, the Kentucky Supreme Court official adopted sections 776, 767, and 773 of the Restatement (Second) of Torts, which explains:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 767B. To recover under this cause of action, a plaintiff must prove: "(1) the existence of a contract; (2) Defendants' knowledge of this contract; (3) that it intended to cause its breach; (4) its conduct caused the breach; (5) this breach resulted in damages to [the Plaintiff]; and (6) Defendant[s] had no privilege or justification to excuse [their] conduct." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995). Furthermore, "[i]n Kentucky, intentional torts require proving proximate cause." *Ventas, Inc. v. Health Care Property Investors, Inc.*, 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009). Such cause can be interrupted by a superseding, or intervening, cause. *Id.* (citation omitted). "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another." *Id.* (quotation omitted).

Jones contends that the Third-Party Defendants were aware that Jones maintained valid business relationships with CBR, SE Book, Blackrock, and ICS, and had an expectancy that these relationships

15

would continue. He alleges that the Third-Party Defendants improperly acted to gain a financial advantage for themselves, thus tortiously interfering with Jones's relationship with the companies. (Docket No. 44 at 29-30.) Namely, he argues that they provided false information about Jones to various entities and individuals, including MacDonald, the third-party who oversaw the Joint Companies' operations. (Docket No. 44 at 20.) According to Jones, these baseless allegations benefitted the Third-Party Defendants and Griffin at Jones's own expense. He alleges that the Third-Party Defendants disseminated false information throughout the Murray business community in an effort to interfere with Jones' relationships with the Joint Companies. (Docket No. 44 at 21.)

Having alleged the above facts, the Court finds that Jones has satisfied the requisite pleading standard with regard to this claim. Although the Third-Party Defendants set forth several persuasive arguments in their Motions to Dismiss, such arguments are more properly raised in a motion for summary judgment. At this time, the Court will not dismiss Jones's claim for intentional interference with business relations against the Third-Party Defendants, as he has alleged facts sufficient to support such a claim.

### IV. Jones's abuse of process claim will be dismissed.

Finally, the Court turns to Jones's claim for abuse of process. Abuse of process involves using a "legal process for some other purpose than that which it was intended by the law to effect." *Raine v. Drasin*, 621 S.W.2d 895, 902 (Ky. 1981). A *prima facie* showing of abuse of process under Kentucky law requires that (1) the process instituted by the defendant was for an ulterior purpose and (2) that the defendant instituting the process must have performed a willful act in using the process that is not a part of the regular conduct of the proceeding. *See Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998).

First, the Court will consider Wittman's motion to dismiss this claim. Wittman argues that the only specific allegation related to this claim as it relates to him asserts that he signed an involuntary bankruptcy petition that contained an allegedly false statement:

> Next, Griffin, along with Farris and Wittman, caused the filing of an involuntary bankruptcy petition against CBR on or about October 4, 2012, falsely claiming that Griffin had loaned CBR $15,000,000,

16

> although he had in other legal pleadings claimed that these funds had been used to purchase his equity interest in the Joint Companies.

(Docket No. 44 at 20.) Jones then alleges that the Defendants' lawsuits against Jones were raised only to punish Jones for not acceding to Griffin's demands and to stop him from creating a company that would compete with their own. (Docket No. 44 at 30.)

In his response brief, Jones asserts new factual allegations, pointing to the involuntary bankruptcy petition wherein Wittman attests that CBR owed him a $158.72 debt. Jones disputes that Wittman was actually owed this debt. (Docket No. 64 at 22.) However, this allegation finds no basis in the Counterclaim; the Court must reject Jones's attempt to amend his original pleading. Jones contends neither that this statement was false or that Wittman knew it was false. Jones identifies no "definite act" that was not authorized by the process. *Simpson*, 962 S.W.2d at 394-95.

More generally, Jones has not alleged that the Third-Party Defendants have taken any legal action against him. The Counterclaim itself states that the lawsuits of which Jones complains were each brought by Jones or third-party entities. (*See* Docket No. 44 at 19, 22.) Jones has not properly alleged that Cohoon has participated in the judicial process—and "[s]ince there is no process, there can be no abuse of process." *Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765 (Ky. Ct. App. 1980).

Moreover, Jones contends that the Defendants attempted to convince law enforcement authorities to press criminal charges against Jones. (Docket No. 64 at 22.) This cannot serve as the basis of an abuse of process claim:, which requires "the irregular or wrongful employment of a judicial proceeding," defined as "all acts of the court." *Bonnie Braes Farms*, 598 S.W.2d at 765; *see also Wigginton v. Scanlon*, 2012 WL 5305077 (Ky. Ct. App. Oct. 26, 2012) ("[T]he first and most essential element of an abuse of process claim is that there be an actual judicial process involved."). Because Jones does not allege that Cohoon's alleged misdeeds involved an act of court, this allegation does not serve as an appropriate basis for Jones's claim.

## CONCLUSION

Therefore, for the reasons explained above, Griffin's Motion to Dismiss will be GRANTED, and the various Third-Party Defendants' Motions to Dismiss will be GRANTED IN PART and DENIED IN PART. An appropriate Order will issue concurrently with this Memorandum Opinion.