UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00163-TBR

DAVID GRIFFIN                                                        Plaintiff

v.

CHARLES JONES, *et al*.                                           Defendant


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on competing motions for summary judgment. Plaintiff David Griffin has filed a motion for summary judgment on all of Defendant Charles Jones's remaining counterclaims.  (DN 154).  Jones has also filed a motion for summary judgment on these counterclaims.  (DN 161).  The parties have completed briefing.  (DN 168, 170, 172).  For the following reasons, Griffin's motion for summary judgment (DN 154) will be GRANTED and Jones's motion for summary judgment (DN 161) will be DENIED.


## BACKGROUND

This action arises from a soured business relationship between Charles Jones and David Griffin.  As with most failed relationships the parties have differing views as to who is at fault.  The task for this Court is to decide whether, as a matter of law, Jones's counterclaims may proceed to trial.

Jones is a businessman from Murray, Kentucky who has spent his career in the education market.  Jones founded his first business, Integrated Computer Solutions, Inc.

("ICS") in 1993.  ICS sold computers and information technology services to schools.  (DN 161).

In February, 2008, Jones met David Griffin, a wealthy cotton farmer, at the Peabody Hotel in Memphis, Tennessee.  (DN 149).  The pair discussed several business ideas, ultimately agreeing to start a venture to buy and sell college textbooks.  (DN 160).  Jones would provide day-to-day management.  Griffin would supply financing, initially investing $100,000.[1]  (DN 18).  They formed a new entity, Blackrock Investments, LLC ("Blackrock"), in March, 2008.  Jones and Griffin each owned 50% of Blackrock.

Blackrock created a subsidiary, SE Book Company, LLC ("SE Book")[2] which was used to purchase a "long-standing textbook wholesaler based in Murray with established customer relationships and distribution channels" and "established sources for textbooks, including bi-annual book buybacks from college students."   (DN 160).  Among SE Book's customers were companies which rented, rather than sold, textbooks to college students.   These companies were tapping a new market: college students shopping online.  Jones observed that these companies "enjoyed substantial demand" but "faced difficulties obtaining supply."  (DN 160).  "Textbook publishers guarded their distribution channels" and were reluctant to sell to rental companies, who they viewed as competitors.  (DN 160).  Jones recognized that SE Book had a "competitive advantage"

---

[1] Griffin states:  "Although we beneficially owned each of the companies 50/50, I supplied funds required for the business operations, while Mr. Jones was solely responsible for the operations of the companies."  (DN 154-2).  Jones states:  "Griffin and I agreed that, with respect to the companies we owned together, I would be responsible operations and he would provide financial support."  (DN 160).

[2] ICS would come to own 8% of SE Book.

over these companies because it had an established supply source for textbooks. Jones approached Griffin about moving into the textbook rental market. In March, 2009, the pair formed College Book Rental Company, LLC ("College Book Rental").[3] Also in 2009, Griffin purchased a 50% share of ICS from a third party for $2 million. (DN 18, 160).

Shortly after both SE Book and College Book Rental were formed they signed a management agreement with CA Jones Management. (DN 160-4). CA Jones Management provided "accounting, banking, human resources, computer and legal services" for the companies. All employees who worked at SE Book and College Book Rental were actually employed by CA Jones Management and "leased" to SE Book and College Book Rental. (DN 160). CA Jones Management charged SE Book and College Book Rental a monthly management fee for its services. While Griffin and Jones co-owned SE Book and College Book Rental, Jones was the sole owner of CA Jones Management.

College Book Rental was "very successful in a short period of time," with gross profit of $6.3 million in 2010 and $19.4 million in 2011. (DN 160). In September, 2011, John Farris of Commonwealth Economics prepared a valuation of SE Book and College Book Rental that valued the companies between $191 million and $319 million. (DN 160).

Despite this apparent success, Griffin and Jones had an escalating dispute over the health and management of the businesses. Griffin claims that Jones regularly informed

---

[3] College Book Rental was owned by a trust, the BR Trust, of which Jones and Griffin were beneficiaries. (DN 160-4, 170-1).

him that the companies would soon be profitable but needed immediate financing to pay operating expenses and purchase inventory.  From 2009 to 2011 Griffin made over 100 transfers of money totaling over $28 million dollars.  (DN 18).  Griffin alleges that, unbeknownst to him, Jones was using the management agreement between CA Jones Management and the co-owned companies to siphon money out of the co-owned companies.  When Jones presented profit forecasts for the companies, he did not include the management fees that CA Jones Management intended to charge.  When Commonwealth Economics evaluated the companies, Jones limited the financial information available to them.  When Commonwealth Economics made recommendations for reducing operating expenses, Jones instead increased management expenses.  For instance, in 2009 SE Book paid approximately $2.4 million in management fees to CA Jones Management, "which exceeded SEB's net earnings before interest and tax."  (DN 18).  In 2010, SE Book paid $4.3 million in management fees, again in excess of SE Book's net income.  Similarly, College Book Rental and ICS paid management fees to CA Jones Management that exceeded net income.  Griffin claims he invested approximately $28 million in reliance upon Jones's representations that the companies would become profitable.  Griffin also guaranteed various bank loans, later paying $19.5 million to satisfy these debts.  Griffin also paid $20 million to settle a claim from a vendor, Baker & Taylor.  (DN 18).  In total, Griffin claims he has lost approximately $75 million as a result of his business relationship with Jones.  (DN 145).

Conversely, Jones alleges that beginning in 2010 "Griffin began demanding that he be given an increased ownership interest" in SE Book and College Book Rental because of his additional investments.  (DN 160).  "In response, I reminded him of our

4

agreement, reached years earlier, that I was responsible for operating the businesses and he was responsible for providing the necessary financial support to operate the businesses." (DN 160). Jones alleges that Griffin demanded and received $1.7 million in September 2011 and $1.07 million in December, 2011. Transferring this money to Griffin "substantially impaired operations and expansion efforts." (DN 160). Jones also claims Griffin "forced Jones to agree to give up half of his interest in CBR for no consideration" but later revoked this agreement. (DN 44). Jones further contends that in July 2012, Griffin persuaded Security Bank to declare its loan to CBR in default, with Griffin paying the loan personally in exchange for the Bank's cooperation in urging Jones to resign his management position with CBR. (DN 44). Griffin also allegedly convinced Planters Bank to withdraw from an agreement restructuring SE Book's loans to pressure the company into bankruptcy. (DN 44). Jones claims SE Book and College Book Rental would have been worth $1 billion were in not for Griffin's actions.

In February, 2012, Griffin filed a lawsuit against Jones in this Court seeking the appointment of a receiver for the companies. In August, 2012, the parties agreed upon the appointment of Myles MacDonald of KraftCPAs Turnaround & Restructuring Group, PLLC. Griffin then dismissed that lawsuit without prejudice. *Griffin v. Jones*, 5:12-CV-00033 (W.D. Ky. 2012). Griffin alleges that MacDonald immediately "discovered substantial, unjustified transfers of funds" among the companies and to entities solely owned by Jones. MacDonald also found that ICS had not collected more than $5 million in accounts receivables because Jones instructed customers to instead pay a Jones-controlled company. Jones also "secretly established and controlled additional companies which were in direct competition" with the jointly owned companies,

5

including a new business which sold textbooks online. (DN 18). MacDonald also "discovered massive discrepancies in the inventory records" with thousands of textbooks missing. (DN 18).

The mystery of the missing textbooks was solved in September, 2012, when McGraw Hill and other publishers filed a lawsuit claiming that Jones, College Book Rental, SE Book, and a web of other entities related to Jones had engaged in a massive "textbook chop shop" scheme. *The McGraw-Hill Companies Inc. v. Jones*, No. 5:14-CV-00042 (W.D. Ky. 2012). The companies purchased "steeply discounted U.S. Edition textbooks, specially priced for distribution in developing companies" and "International Edition" textbooks from "nontraditional suppliers." *McGraw-Hill Glob. Educ., LLC v. Griffin*, No. 5:14-CV-00042-TBR, 2014 WL 5500505, at *1 (W.D. Ky. Oct. 30, 2014). Employees were instructed to remove copyright pages, replace ISBN numbers, and remove any markings indicating the textbooks were non-standard with hot irons, dremels, and slicers. *Id*. at *1. As the scheme matured Jones toured a book-printing factory. Jones then purchased a printing business to create high quality look-alike textbook covers. To provide a front for their claim that books were being distributed internationally, Jones formed four entities in the Dominican Republic. *Id*. at *2. Jones admitted to copyright infringement and Jones, along with the entities he controlled, settled for $900,000. (DN 159-2). Griffin alleges he had no knowledge of this scheme. (DN 18). The publishers' case against Griffin is still ongoing.

The *McGraw Hill* case is but one of a multitude of lawsuits involving Jones and Griffin. This Court previously noted eight lawsuits in Kentucky state and federal courts alone. *McGraw-Hill*, 2014 WL 5500505, at *1. Bankruptcy petitions, either voluntary or

involuntary, have been filed for College Book Rental (DN 57-1), ICS (DN 57-2), SE Book (DN 57-3), Blackrock (DN 57-4), and Jones (DN 169).  Griffin claims he has secured judgment in excess of $16 million against Jones "in two other matters styled *CBR Funding, LLC v. Charles A. Jones, et al.*, No. 1:13-CV- 01280-JDB-egb, U.S. District Court, Western District, Tennessee, and *Planters Bank, Inc. v. SE Book Company, LLC, et al.*, No. 12-CI-00430, Circuit Court, Calloway County, Kentucky."  (DN 137).

Griffin has moved to dismiss his claims against Jones without prejudice.  (DN 137).  Currently before the Court are the competing motions for summary judgment on Jones's counterclaims.

## STANDARD

Summary judgment is proper if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence.  To support this position, he must present evidence on which the trier of fact could find for the plaintiff.  *See id.* (*citing*

*Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Before the Court are the competing motions for summary judgment on Jones's claims that Griffin (I) breached his fiduciary duties; (II) tortiously interfered with Jones's contracts and business expectancy; and (III) committed abuse of process.  This Court previously dismissed Jones's claim that Griffin and others violated Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act.  (DN 103).  The parties make several fact-based arguments which are inappropriate for disposition on summary judgment.  However, the Court finds that Griffin also stated valid arguments for why Jones's counterclaims fail as a matter of law.

### I.      Breach of Fiduciary Duty.

The Kentucky Supreme Court has explained that generally, a fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another." *Steelvest, Inc. v. Scansteel Serv. Cntr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).  The relationship must also involve "an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Id*.  To prevail upon a claim for breach of fiduciary duty, a plaintiff must demonstrate: (1) that the defendant owes a fiduciary duty to the plaintiff; (2) that the

8

defendant breached that duty; and (3) that the plaintiff suffered damages as a result of the breach. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 665 (E.D. Ky. 2009).

Griffin makes two arguments for why Jones's breach of fiduciary duty claim must fail. Griffin argues (A) he did not owe a fiduciary duty to Jones. Griffin also argues that even if he did owe a fiduciary duty, (B) Jones has failed to show conduct that would constitute a breach.

### A. Fiduciary Duty.

First, Griffin argues that he did not owe a fiduciary duty to Jones. This analysis is complicated by the fact that Griffin and Jones were partners in several businesses which have different corporate forms and were formed under the laws of multiple states. The Court will address whether Griffin owed Jones a fiduciary duty for (i) ICS, (ii) Blackrock, (iii) SE Book, and (iv) College Book Rental.

### i. Integrated Computer Solutions.

Integrated Computer Solutions, Inc. is a Kentucky corporation that was incorporated in 1993. Jones is the CEO of ICS. His wife, Sarah Jones, is the Secretary. Stuart Bain was previously a Vice President. (DN 24-1). In 2008, Bain sold his 50% stake in ICS to Griffin for $2 million. (DN 18). Griffin is a stockholder in ICS but has never been an officer or director of ICS.

In Kentucky, a stockholder does not owe a fiduciary duty. *Compare* KRS § 271B.7 *with* KRS § 271B.8-300 *and* KRS § 271B.8-420. Other states have held that a stockholder may owe a fiduciary duty in the special case of closely-held corporations. *See e.g. Crosby v. Beam*, 548 N.E.2d 217, 220 (1989) (explaining circumstances in which a stockholder can owe a fiduciary duty to another stockholder under Ohio law).

9

Kentucky has not adopted this rule. *Estep v. Werner*, 780 S.W.2d 604 (Ky. 1989)[4]; Thomas E. Rutledge, *Shareholders Are Not Fiduciaries: A Positive and Normative Analysis of Kentucky Law*, 51 U. Louisville L. Rev. 535, 535 (2013) (explaining the history of cases and legislation on this issue and advocating that Kentucky not adopt such a rule).

Griffin is a mere stockholder in ICS. Therefore, as a matter of Kentucky law, Griffin does not owe Jones a fiduciary duty as an ICS stockholder.

### ii. Blackrock.

Blackrock is a Kentucky limited liability company. Griffin and Jones each own 50% of Blackrock. Blackrock was originally organized on March 27, 2008 as member-managed limited liability company. (DN 160-1). On January 20, 2009, it was converted to a manager-managed limited liability company. (DN 154-6). Jones is the manager.[5] Griffin is a member.

"Under Kentucky law, fiduciary duties are generally concomitant with the responsibility for management of the LLC." *Xcell Energy & Coal Co., LLC v. Energy Inv. Grp.*, LLC, 2014 WL 2964076, at *6 (Del. Ch. June 30, 2014); *see also Patmon v. Hobbs*, 280 S.W.3d 589, 591 (Ky. Ct. App. 2009) ("one entrusted with active corporate management, such as officer or director or manager-member, occupies fiduciary relationship"). A Kentucky LLC can be managed either by its members or by a manager.

---

[4] In his dissent, Justice Leibson argues the *Estep* court erred in not joining the "growing number" of states which have imposed fiduciary duties upon stockholders in closely held corporations. *Estep v. Werner*, 780 S.W.2d 604, 609 (Ky. 1989) (J. Leibson, dissenting).

[5] This Court previously stated that CA Jones Management was the manager of Blackrock. (DN 39). While CA Jones Management provided management services to Blackrock, Jones was the manager.

KRS § 275.025(1)(d).  If an LLC is member-managed, then the members have fiduciary duties.  Conversely, if the LLC is manager-managed, then the manager owes fiduciary duties, but the members do not.  *Xcell*, 2014 WL 2964076, at *6 ("Unless provided otherwise in the LLC's operating agreement, if a Kentucky LLC is managed by its managers, then, by Kentucky statute, its members do not manage the LLC and thus do not owe fiduciary duties to the LLC");  Thomas E. Rutledge, *Shareholders Are Not Fiduciaries: A Positive and Normative Analysis of Kentucky Law*, 51 U. Louisville L. Rev. 535, 547 (2013) ("By statute, the members in a manager-managed limited liability company do not govern the LLC and do not owe fiduciary duties").

Griffin is a member of Blackrock, a manager-managed LLC.  Jones is the manager of Blackrock.  Therefore, as a matter of Kentucky law, Griffin does not owe a fiduciary duty to Jones as a member of Blackrock.

Jones argues that this Court previously held that Griffin owes a fiduciary duty to Jones when it stated that "a member of a limited liability company owes a duty of loyalty to fellow members."  (DN 39).  The Court was speaking in the context of whether Jones, the manager-member of Blackrock, owed a fiduciary duty to a member, Griffin.  Admittedly, this Court's language was over-inclusive.  Similarly, other courts have made overbroad statements on this issue which, taken out of context, would support Jones's position.  For instance, the *Patmon* court held "Kentucky limited liability companies, being similar to Kentucky partnerships and corporations, impose a common-law fiduciary duty on their officers and members in the absence of contrary provisions in the limited liability company operating agreement." 280 S.W.3d at 594.  However, in *Patmon* the issue was the fiduciary duties of a manager-member.  The statements in *Patmon* should

11

be viewed in that context.  *See Chou v. Chilton*, 2014 Ky. App. Unpub. LEXIS 1029 *9-10 (Ky. Ct. App. 2014) (unpublished) ("Chou argues that *Patmon*, *supra*, holds that every member of a limited liability company owes a duty of loyalty and fiduciary duty to every other member of the company . . . . This is not an accurate reading of *Patmon*").

### iii.   SE Book.

SE Book is a Kentucky limited liability company that was organized on May 27, 2008.  Neither Griffin nor Jones have an ownership interest in SE Books.  Instead, SE Book is owned by Blackrock.  (DN 160-2).  SE Book was originally organized as a member-managed limited liability company with Blackrock as the sole member.  On February 17, 2009, it was converted to a manager-managed limited liability company. Jones is the manager.

Griffin does not owe Jones a fiduciary duty arising out of SE Book because Griffin is not a manager of SE Book.

### iv.   College Book Rental.

College Book Rental is a Wyoming limited liability company.  The sole member of College Book Rental is the BR Trust.  College Book Rental is manager-managed. (DN 160-4).  Jones is the manager.

Wyoming law imposes fiduciary duties of loyalty and care upon a member in a member-managed limited liability company.  W.S. § 17-29-409(a).  If the limited liability company is manager-managed, then non-managing members are expressly exempted from these fiduciary duties.  W.S. § 17-29-409(g).

Griffin is neither a manager nor a member of College Book Rental.  Accordingly, Griffin does not owe Jones a fiduciary duty arising out of College Book Rental.

### B.    Conduct That Would Constitute Breach of a Fiduciary Duty.

Griffin also argues that, even if he were held to owe a fiduciary duty to Jones, none of his alleged conduct constitutes a breach of fiduciary duty.  The Court finds that resolution of this issue requires factual findings that would make it inappropriate for summary judgment.

Jones claims Griffin breached his fiduciary duties when he "went behind Jones's back, purchased the Security Bank Debt, then sued Jones and his wife on their guarantees."  Jones also argues Griffin breached his fiduciary duties by "cutting off funding" and seeking to put College Book Rental into involuntary bankruptcy.  (DN 161).

Neither party has cited Kentucky case law on whether the purchase of a shared debt by one of the debtors may constitute a breach of fiduciary duty.  Jones relies upon the Idaho case of *Thomas v. Schmelzer*, 796 P.2d 1026, 1028 (Id. Ct. App. 1990).  In *Schmelzer*, two couples, the Thomases and Schmelzers, formed a partnership to purchase and manage real estate.  During the course of the partnership they became indebted to the Hursts.  In 1985 the partnership dissolved.  The wind-up process was protracted and culminated in litigation.  During the wind-up process, the Thomases purchased the "Hurst contracts," thereby becoming secured creditors of the partnership.  A few days before trial they sent notice of default to the Schmelzers, who by that notice first learned of the purchase.  *Id*. at 1029.  The trial court held the Thomases actions did not breach their fiduciary duty.  The Idaho Court of Appeals reversed.  It acknowledged that the

13

Thomases "purchased the Hurst contracts to avoid the consequences of default." However, it held their "goal may be acceptable, but the law refuses to recognize this basis as a justification for finding no breach of a fiduciary duty." 796 P.2d at 1032. Jones notes that several other states courts have cited *Schmelzer* with approval. *See e.g. Pilney v. Hovland*, 1993 Minn. App. LEXIS 1241 (Minn. Ct. App. 1993) ("By obtaining appellant's guaranty contract and enforcing it against him, respondents attempted to gain a legal advantage over appellant, a fellow partner, and that is a breach of fiduciary duty"); *BT-I v. Equitable Life Assurance Soc'y of the United States*, 89 Cal. Rptr. 2d 811, 815 (Cal. App. Ct. 1999) (citing *Schmelzer* for proposition that "acquisition of partnership debt by a general partner" may be a breach of fiduciary duty); *Dean Operations v. One Seventy Assocs.*, 896 P.2d 1012 (Kan. 1995).

The Court finds that the above cases are distinguishable on factual and legal grounds, but they do provide support for the general proposition that the purchase of partnership debt by one partner may breach a fiduciary duty in certain circumstances. However, whether Griffin actually breached a fiduciary duty requires additional factual determinations, including when Griffin purchased the debts, which debts were purchased, which entities owed these debts, and so forth. As this Court has already found that Griffin does not owe a fiduciary duty to Jones, the Court will decline to make factual findings as to whether Griffin's actions violated a hypothetical fiduciary duty. Therefore, this issue is inappropriate for summary judgment. *See Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 198-200 (Ky. 2013), *as modified* (Feb. 20, 2014).

14

Similarly, this Court requires additional factual findings before addressing whether Griffin's initiation of litigation constituted a breach of fiduciary duties.   A fiduciary may file litigation without breaching those fiduciary duties.   *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 37 (D.C. Cir. 2010); *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991 (Md. Ct. App. 2007).   However, the fiduciary's intent in filing litigation is relevant to whether he acted in good faith or not, and this inquiry is generally factual in nature.   *Cafesjian* 692 F. Supp. at 37 ("Here, Cafesjian's testimony regarding his intentions may or may not be credited by a jury, and a jury may conclude that he was justified in filing the lawsuits to protect the interests he had contracted with AGM&M").

Accordingly, unresolved factual issues prevent the Court from addressing whether Griffin's actions would constitute a breach of his fiduciary duties.   However, as this Court has already found that Griffin did not owe a fiduciary duty to Jones, Griffin is still entitled to summary judgment on this claim.

## II.   Tortious Interference with Contract and Business Expectancy.

Jones claims Griffin intentionally interfered both with Jones's contracts and with Jones's prospective business relationships.   The two torts have similar elements.

A claim for tortious interference with contractual relations has six elements:   (1) the existence of a contract; (2) knowledge of this contract; (3) intent to cause a breach; (4) conduct that caused the breach or prevented the contract from coming into being; (5) damages; and (6) lack of privilege or justification to excuse the conduct.   *Marcus & Millichap Real Estate Inv. Brokerage Co. v. Skeeters*, 395 F. Supp. 2d 541, 552-53 (W.D. Ky. 2005) (citing Restatement (Second) of Torts § 766).

15

A claim for tortious interference with a business expectancy also has six elements: "(1) the existence of a valid business relationship or its expectancy; (2) defendant's knowledge thereof, (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages." *Monumental Life Ins. Co. v. Nationwide Ret. Sols., Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003); *NCAA v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1998).

Griffin argues that both of Jones's claims fail as a matter of law because:  (A) Jones has not alleged the existence of a contract; (B) nor identified a breach of contract; and (C) Jones has not identified a business expectancy.  The Court will then address the parties' (D) miscellaneous arguments regarding Jones's tortious interference claims.

### A.  The Existence of a Contract.

Jones alleges that Griffin tortiously interfered with the operating agreements of Blackrock, SE Book, and College Book Rental, and the management agreement between CA Jones Management and College Book Rental.

Griffin argues that these contracts cannot support a claim for tortious interference because, except for the Blackrock operating agreement, Jones is not a party to these agreements.  "At a minimum, to be actionable," a party claiming tortious interference with a contract "must show that a contract existed between it and a third party followed by a breach by the third party." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).

The Court agrees with Griffin that Jones is not a party to these agreements and therefore cannot base a tortious interference with contract claim upon them.  The operating agreement of SE Book lists Blackrock and ICS as members and signatories.

(DN 160-2).  The operating agreement of College Book Rental lists the BR Trust as the sole member and signatory.  (DN 160-4).  The management agreement between CA Jones Management and College Book Rental lists only those entities as parties and signatories.  (DN 160-3).  Jones is not a party to any of these agreements and therefore Jones cannot, in his individual capacity, assert a claim for tortious interference with these contracts.[6]

Griffin admits that Jones signed the Blackrock operating agreement. Nevertheless, Griffin argues that the Blackrock operating agreement cannot provide a basis for Jones's tortious interference claim because Griffin is also a party to that agreement.  A claim for tortious interference with contract requires not just a contract between the claimant and a third party, but also necessarily implies that the person causing the breach of that contract is not himself a party to the contract.  In other words, a person cannot tortiously interfere with a contract to which they are a party.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995) ("Kentucky courts would not adopt the tort of interference with another's performance of his own contract"); *Ronald A. Chisholm, Ltd. v. Am. Cold Storage, Inc.*, 2013 WL 4499014, at *4 (W.D. Ky. Aug. 20, 2013); *see also Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) ("A party may not be charged with tortious interference with respect to its own contract").  As both Jones and Griffin are parties to the Blackrock operating agreement, Griffin cannot be held to have tortiously interfered with that agreement.

---

[6] Jones did sign the SE Book operating agreement and the management agreement between CA Jones Management and College Book Rental.  However, Jones signed these agreements in his representative capacity as an officer of one of the signatories, not in his individual capacity, and therefore cannot enforce these agreements in his individual capacity.  *Pannell v. Shannon*, 425 S.W.3d 58, 65 (Ky. 2014).

### B.  Breach of Contract.

Griffin also argues that Jones's tortious interference claims fail as a matter of law because Jones has not identified any contract which was breached.  Jones's tortious interference claims arise out of the operating agreements of Blackrock, SE Book, and College Book Rental, and the management agreement between CA Jones Management and College Book Rental.  However, in his counterclaim Jones does not allege that any of these agreements were breached.  (DN 44).  Nor in his arguments has Jones identified a contract that was breached, instead vaguely claiming that "Griffin intended to, and did, cause the breach of contract."  (DN 172).[7]  Without having identified a contract which was breached, Jones cannot maintain a claim for tortious interference with contract.

### C.  Existence of a Business Expectancy.

Jones also claims that Griffin tortiously interfered with Jones's prospective business relationships.  Jones's bases this claim on his ongoing relationships with Blackrock, SE Book, ICS, and CA Jones Management.  Griffin responds that these relationships are not a valid business expectancy because they are already established.

A claim for tortious interference with a prospective business advantage is, by definition, prospective.  It is a claim that an unripe courtship would have blossomed into a relationship, but for the tortfeasor's actions.  *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009) ("A valid business expectancy exists when there is 'a reasonable likelihood or a probability, not mere wishful thinking' that a business relationship will come about") (*quoting Lucas v. Monroe County*, 203

---

[7] Jones also argues that Griffin "inten[ded] to cause a breach of the Management Agreement" between College Book Rental and CA Jones Management.  (DN 168).  However, Griffin does not allege that the management agreement was actually breached.

F.3d 964, 979 (6th Cir. 2000)).  Once the parties have consummated their relationship in the form of a contract, tortious interference with that relationship would be a claim for tortious interference with contract.  The Restatement Second of Torts § 766B explains:

> The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry (see § 698), if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. Also included is interference with a continuing business or other customary relationship not amounting to a formal contract. (comment (c)).[8]

"In short, intentional interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract."  *Preston v. Atmel Corp.*, 560 F. Supp. 2d 1035 (D. Colo. 2008).

Each business relationship upon which Jones bases his tortious interference claim has been reduced to a formal agreement.  Jones has not identified a prospective relationship with which Griffin could have interfered.  Accordingly, Jones's claim for tortious interference with a prospective business relation fails as a matter of law.

### D.  Miscellaneous.

Finally, the parties raise several miscellaneous arguments regarding Jones's tortious interference claims.  As previously stated, to the extent the parties dispute factual issues, the Court finds these arguments inappropriate for summary judgment.  For

---

[8] Comment (a) also states:  "This Section is concerned only with intentional interference with prospective contractual relations, not yet reduced to contract. The rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff is stated in § 766 [Intentional Interference with Performance of Contract by Third Person]."

19

instance, the parties dispute whether Griffin had a justification for his actions or whether he acted with malice.  Generally, a party's motive is an issue of fact and therefore inappropriate for summary judgment.  *Bourbon Cty. Joint Planning Comm'n v. Simpson*, 799 S.W.2d 42, 46 (Ky. Ct. App. 1990); *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012); *but see Monin v. Wal-Mart Real Estate Bus. Trust*, 2008 WL 352346, at *2 (Ky. Ct. App. Feb. 8, 2008) ("the allegation that Wal–Mart acted in its legitimate business interests, which just happened to be contrary to Monin's personal wishes, does not in-and-of itself constitute a proffer of malice or bad faith by Wal–Mart").

Griffin also argues that the *Noerr-Pennington* doctrine is a defense to Jones's claims.  *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).  "As originally conceived by the Supreme Court, this doctrine held that 'business interests may combine and lobby to influence the legislative, executive, or judicial branches of government or administrative agencies without violating the antitrust laws, because such activities are protected by the first amendment right of petition.'"  *White v. Ashland Park Neighborhood Ass'n, Inc.*, 2009 WL 1974750, at *5 (Ky. Ct. App. 2009) (*quoting Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir.1992)).  "[O]ver time, other federal and state courts have extended its use beyond that area to more broadly protect First Amendment petitioning of the government from a number of claims brought under federal and state laws—including business torts."  *Id.* (collecting cases).  "The ultimate effect of the *Noerr–Pennington* doctrine when applied in this broader sense is that 'if a

party's actions are protected by the First Amendment, then that party is immune to suit.'"
*Id*. (quoting *Wilder v. Hall*, 501 F.Supp.2d 887, 895 (E.D.Ky.2007)).

Jones argues that the "sham" exception to the *Noerr–Pennington* doctrine defeats
Griffin's argument.   "[U]nder a 'sham exception' to this doctrine, activity ostensibly
directed toward influencing governmental action does not qualify for *Noerr* immunity if
it is a mere sham to cover an attempt to interfere directly with the business relationships
of a competitor." (citation and punctuation omitted) *Octane Fitness, LLC v. ICON Health
& Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014).   "This narrow exception requires that the
substance of the petitioning activity or communications must be 'objectively baseless' or
'patently frivolous' and must be intended to conceal and interfere with a business
relationship to obviate immunity."   *RaceTech, LLC v. Ky. Downs, LLC*, 2016 U.S. Dist.
LEXIS 32101 *14 (W.D. Ky. 2016).

This Court will follow others that have refrained from unnecessarily addressing
the scope of the *Noerr-Pennington* doctrine.   *See e.g. E. Kentucky Res. v. Arnett*, 892
S.W.2d 617, 618 (Ky. Ct. App. 1995).   First, this Court has already found that Jones's
tortious interference claims fail as a matter of law.   Second, while some of Griffin's
actions (e.g. providing information to law enforcement) are arguably covered by the
doctrine, it appears that other actions (e.g. purchasing the debts of Jones-controlled
companies) are not.   Therefore, resolution of this issue would not assist in determining
whether summary judgment is appropriate in this case.

The Court finds that, as a matter of law, Griffin is entitled to summary judgment
on Jones's tortious interference claims because Jones has not identified a contract to

which he was a party (or one which Griffin was not also a party), has failed to show that any contract was breached, and has not identified a prospective business relation.

### III.    Abuse of Process.

Jones's final claim against Griffin is for abuse of process.  "Generally stated, one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which that process is not designed, is subject to liability to the other for harm caused by the abuse of process." *Sprint Commc'ns Co., L.P. v. Leggett*, 307 S.W.3d 109, 113 (Ky. 2010).  "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Flynn v. Songer*, 399 S.W.2d 491, 494 (Ky. 1966); *see also Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765, 765 (Ky. Ct. App. 1980).  This tort differs from malicious prosecution in that "malicious prosecution consists in maliciously causing process to be issued, whereas an abuse of process is the employment of legal process for some other purpose other than that which it was intended by the law to effect." *Raine v. Drasin*, 621 S.W.2d 895, 902 (Ky. 1981).

"The essential elements" of a claim for abuse of process are '(1) an ulterior purpose and (2) a wilful act in the use of the process not proper in the regular conduct of the proceeding.'" *Bonnie Braes Farms*, 598 S.W.2d at 765 (citing W. Prosser, Handbook of the Law of Torts, s 121 (4th ed. 1978)).  Both elements must be present, as "there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even if we assume *arguendo* bad intentions." *Simpson v. Laytart*, 962 S.W.2d 392, 395 (Ky. 1998).  "[T]here is no action for abuse of process when the

process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."  Restatement (Second) of Torts § 682 (1977) ("nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor").

Two cases illustrate the difference between the proper use of process, though ill-motivated, and an abuse of process.  In *Mullins v. Richards* a dispute arose over the quality of car repair work done by Norman Mullins.  705 S.W.2d 951 (Ky. Ct. App. 1986).  Two of Mullins' customers were dissatisfied and "appeared before a Boyle County Grand Jury seeking indictments against [Mullins] for theft by deception of over $100.00."  *Id*. at 952.  Mullins was charged.  However, the criminal court declared a mistrial after hearing testimony from the first witness.  *Id*.  Mullins subsequently brought a civil action against his former customers for abuse of process.  The trial court granted a directed verdict against Mullins.  The Kentucky Court of Appeals affirmed, holding:

> Although appellees may have had an ulterior purpose in securing the indictments against appellant, the record contains no evidence that appellees attempted to use the indictments against appellant outside the criminal proceeding.  In fact, appellant testified that he had no contact with appellees between the date of the indictment and the date of trial.  If appellees had offered to drop the indictments in return for a release of their debts to appellant, then appellant would have stated a cause of action on his claim for abuse of process.  705 S.W.2d at 952.

In *Garcia*, car troubles led to an abuse of process claim with a different outcome. *Garcia v. Whitaker*, 400 S.W.3d 270, 277 (Ky. 2013).  In that case an attorney, Whitaker, brought his Porsche in for repair to a mechanic, Garcia.  After completing repairs Garcia presented the car to Whitaker.  The parties disputed the bill and Garcia retained

possession of the Porsche, keeping it at a neighbor's house as he suspected Whitaker would try to repossess the vehicle.  Whitaker filed a criminal complaint against Garcia. Whitaker then "accompan[ied] the arresting deputy sheriff and detective to Garcia's home" where the sheriff required Garcia to disclose the whereabouts of the vehicle.  *Id*. at 277.  Garcia was arrested and spent the night in jail.  *Id*. at 273.  Whitaker regained possession of the vehicle.  Thereafter, Whitaker took no part in prosecuting Garcia and the charges were subsequently dropped.  *Id.* at 277.

Garcia brought a civil suit against Whitaker to recover the cost of repair and assert an abuse of process claim.  The trial court granted a directed verdict in Whitaker's favor and the Kentucky Court of Appeals affirmed.  The Kentucky Supreme Court reversed. 400 S.W.3d at 273-74.  It held that Garcia had stated a valid claim for abuse of process because a jury could conclude that Whitaker had an ulterior motive in instituting criminal process and "[t]here is no doubt that it was outside the ordinary process for Whitaker to accompany the arresting deputy sheriff and detective to Garcia's home in perfecting the arrest and obtaining his Porsche."  *Id*.  ("Undoubtedly, this is an illegitimate use of the criminal process").

Jones and Griffin have been embroiled in multiple prior lawsuits.  In 2012, Griffin sued Jones in this Court seeking the appointment of a receiver for the companies at issue in this case.  *Griffin v. Jones*, 5:12-CV-00033 (W.D. Ky. 2012).  Griffin dismissed his claims without prejudice after Myles MacDonald was appointed as a receiver.  Griffin asserted various claims against Jones in a following Kentucky state court action and cross-claims in a North Carolina federal court case.  Griffin subsequently dismissed these claims without prejudice.  (DN 141-4).  Griffin alleges these claims were brought to

24

protect his interest. Jones alleges that Griffin pursued these prior claims "for the improper purpose of punishing Jones for not agreeing to his demands and to prevent him from creating a competing company." (DN 44).

Jones fails to state a claim for abuse of process because, although he argues that Griffin acted with an improper motive, Jones has not identified any misuse of process by Griffin. Jones alleges that Griffin "sued Jones in an effort to take in litigation something Jones would not give him and to which he was not entitled." (DN 161). Assuming this characterization of Griffin's motive is correct, it still does not constitute abuse of process because Griffin is using civil process for the purpose for which it is intended.

CONCLUSION

The Court finds that, as a matter of law, Griffin is entitled to summary judgment on Jones's counterclaims. Jones has failed to establish that Griffin owed Jones a fiduciary duty. Additionally, Jones has not identified the existence of a contract or business expectancy which would support Jones's tortious interference claim. Finally, Jones has not alleged that Griffin misused process in a manner to support an abuse of process claim.

For the foregoing reasons, Plaintiff David Griffin motion for summary judgment (DN 154) is GRANTED and Defendant Charles Jones's motion for summary judgment (DN 161) is DENIED.

cc:     Counsel