# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF KENTUCKY

# PADUCAH DIVISION

## CIVIL ACTION NO. 5:12-CV-00163-TBR-LLK

DAVID GRIFFIN,                                                    *Plaintiff,*

v.

CHARLES A. JONES, *et al.*,                                      *Defendants.*

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on a Motion for Summary Judgment filed by Defendants Charles A. Jones, CA Jones Management Group ("CJM"), Global Book Resellers, LLC ("Global Book"), and Technology Associates, LLC ("TAI") (collectively, "Defendants"). [R. 190.] Plaintiff David Griffin responded. [R. 197.] In his response, Griffin attached the declarations of Kenny Hoover, Michael White, Dan Foster, Mark Whitaker, and David Griffin and a memorandum attributed to Myles MacDonald. [R. 197, Ex. 1-6.] Defendants replied, in which Defendants requested the Court strike the affidavits [R. 201.] Plaintiff filed a response [R. 210], and Defendants replied. [R. 211.] Fully briefed, the matter is now ripe for adjudication.

For the reasons stated herein, the Court will not strike the declarations of Hoover, [R. 197-2], White, [R. 197- 3], and Foster, [R. 197- 5]. The Court will reopen discovery for the narrow purpose of permitting Jones to take Hoover, White and Foster's depositions if he so chooses. Because the Court will reopen discovery, the Defendants' Motion for Summary

Judgment is **DENIED with leave to refile**. For the reasons stated herein, the stated portions of the remaining affidavits of David Griffin, [R. 197-1], and Mark Whitaker, [R. 197-4], will not be considered by the Court at this time. Lastly, the information contained in MacDonald's memorandum, [R. 197-6], is immaterial to resolving Defendants' motion for summary judgment, therefore, Defendants' request to strike the memorandum is moot.

## BACKGROUND

The instant litigation is the latest product of the soured business relationship between Charles A. Jones and David Griffin. In way of background, Jones is a businessman from Murray, Kentucky who has spent his career in the education, technology, and real estate business. [R. 160 at 2, ¶¶ 3–4 (Jones' Affidavit).] He first met Griffin, a wealthy cotton farmer from Helena, Arkansas, at the Peabody Hotel in Memphis, Tennessee in February 2008. [R. 147-1 at 232–33 (Jones' Deposition I); R. 152-1 at 8, 22–23 (Griffin's Deposition I).] Griffin mentioned he was looking for new investment opportunities, and Jones had just the thing. [R. 160 at 2, ¶ 8.]

Jones described two of his companies—Integrated Computer Solutions, Inc. ("ICS") and Cabling Concepts, Inc. ("Cabling Concepts")—as one such investment opportunity. [R. 160 at 2, ¶ 8; R. 197-1 at 3, ¶ 3 (Griffin's Affidavit).] ICS and Cabling Concepts were companies whose business was based on performing contracts under a federal subsidy program known as "eRate." [R. 197-1 at 3, ¶ 3.] Under the eRate program, the federal government footed most of the bill when school districts contracted with third-party vendors to provide information technology infrastructure and services. [R. 197-1 at 3, ¶ 3.] Griffin expressed interest in this venture, [R. 160 at 2, ¶ 8], and subsequently purchased a one-half interest in Cabling Concepts and in ICS

from third-parties. [R. 197-1 at 3, ¶ 3; R. 160 at 3, ¶ 9; R. 152-1 at 27–31.] Jones retained the remaining half. [R. 197-1 at 3, ¶ 3; R. 160 at 3, ¶ 9.]

Soon after Griffin acquired an interest in ICS and Cabling Concepts, Jones approached Griffin with a second investment opportunity—this time in the college textbook industry. [R. 160 at 2, ¶ 8.] Again, Griffin expressed interest, and together he and Jones purchased SE Book Company, LLC ("SE Book"). [R. 160 at 3, ¶ 11; R. 197-1 at 4, ¶ 6; *see also* R. 160-2 (SE Book Operating Agreement).] SE Book was a "long-standing textbook wholesaler" based in Murray, Kentucky with "established customer relationships and distribution channels." [R. 160 at 3, ¶ 13.] One year later, the gentlemen expanded into the textbook rental market as well. [R. 160 at 4–5, ¶ 16.] To that end, Griffin and Jones formed College Book Rental Company, LLC ("College Book Rental"). [R. 160 at 4–5, ¶ 16; R. 152-1 at 30–31; *see also* R. 160-4 (College Book Rental Company Operating Agreement).]

Over the next two or three years, Griffin and Jones carried on these (and other) businesses together. Each arrangement was roughly the same. The two agreed to split ownership on an equal basis. [R. 154-2 at 2, ¶ 2 (Griffin's Declaration); R. 160 at 3, ¶ 12; R. 152-1 at 30–31.] Jones assumed responsibility for the day-to-day management of the businesses, and Griffin agreed to provide the necessary financial support. [R. 154-2 at 2, ¶ 2 (Griffin's Declaration); R. 160 at 3, ¶ 12; R. 152-1 at 30–31.]

Jones managed these jointly-owned companies through the CA Jones Management Group, LLC ("the Jones Management Group"). [*See* R. 160 at 2, 5, ¶¶ 6, 17.] With respect to SE Book and College Book Rental, at least, the gentlemen reduced the arrangement to writing. [*See* R. 160-3 (Management Agreement with College Book Rental Company).] Under the management agreement, the Jones Management Group provided "accounting, banking, human

3

resources, computer and legal services" for the jointly-owned companies. [R. 160 at 5, ¶ 17.] In exchange, the Jones Management Group charged SE Book and College Book Rental a monthly management fee. [*See* R. 197-1 at 5, ¶ 8 (Griffin's Declaration).]

At first, things went well. For example, College Book Rental showed a gross profit of $6,327,108 in 2010, which tripled to $19,287,607 in 2011. [R. 160 at 5, ¶ 18; *see also* R. 160-5 at 6 (College Book Rental's Financials).] By September 2011, the business was valued somewhere between $191,750,000 and $319,584,000. [R. 160 at 5–6, ¶ 19; *see also* 160-6 at 6 (Commonwealth Economics' Report).]

Despite this apparent success, Griffin and Jones had an escalating dispute over the health and management of the jointly-owned businesses. By 2012, the entire enterprise was falling apart. A large swath of lawsuits, including this one, followed. During the course of that litigation, Griffin allegedly made some unpleasant discoveries:

First, Griffin maintains that Jones omitted the fraudulent and criminal activity that was occurring behind the scenes at ICS and Cabling Concepts when he persuaded Griffin to purchase 50% of the stock in both companies. [R. 197 at 2 (Motion for Summary Judgment).] According to Kenny Hoover, a former employee of Jones, ICS was submitting padded invoices to school districts and to the federal government. [R. 197-2 at 2, ¶ 3 (Hoover's Declaration).] In addition, Hoover admitted to transporting valuable items from Jones to Ashley Jordan—the person responsible for awarding contracts under the eRate program in Crockett County, Tennessee— allegedly as bribes. [R. 197-2 at 2–3, ¶ 3.] Had Griffin known about those activities at the time, he never would have "invested in either Cabling Concepts or ICS," or, for that matter, "any other business" with which "Jones was associated." [R. 197-1 at 3, ¶ 4.]

Second, Griffin alleges that Jones colluded with the outside accountants (Art Sparks and his accounting firm, Alexander Thompson Arnold ("ATA")) performing regular audits of the textbook companies in order to falsify the financial reports. He claims they accomplished this by dramatically overstating the inventories of books. [R. 197-1 at 4]. This involved a scheme in which Sparks advised Jones as to how many books would need to be physically counted in the audit, and then Jones prepared specific bins with the target number of books to be "randomly" selected and counted by ATA. [R. 197-4 at 3, ¶4 (Whitaker's Declaration).]

Lastly, Griffin asserts that Jones used his power over the textbook companies to divert money from companies in which Griffin had an interest, as well as money directly invested by Griffin, to companies in which Griffin had no interest, [R. 197-4 at 2-3, ¶3], or to Jones's own pocket, [R.197 at 5]. Jones allegedly accomplished this through charging broad "management fees" through the Jones Management Group that essentially enhanced his personal salary [R. 197-1 at 5-6] and by transferring funds as he pleased that were directly invested by Griffin into SEB, [R. 197at 5].

Griffin filed this action in 2012.[1]  [R. 18 at 2, ¶¶ 2–6 (Amended Complaint).]  He brings claims for securities fraud, breach of fiduciary duty, and common-law fraud against Jones and the Jones Management Group.  [R. 18 at 22–25, ¶¶ 88–105.]  In addition, he brings claims for misappropriation and for unjust enrichment against Jones and the Jones Management Group, as well as Global Book Resellers, LLC and Technology Associates, Inc.  [R. 18 at 25–27, ¶¶ 106–117.]

Jones responded with a counterclaim against Griffin and a third-party claim against John Farris, Commonwealth Economics, LLC, John Wittman, Joe Pat Cohoon, and CBR Funding,

---

[1] In a prior opinion, the Court dismissed Griffin's claims against Sarah Jones.  [R. 37 (Memorandum Opinion).]

LLC. [R. 44 at 15–30, ¶¶ 1–74 (Counterclaim and Third-Party Claim).] Jones brought claims for racketeering, [R. 44 at 24–28, ¶¶ 41–61], for breach of fiduciary duty, [R. 44 at 28–29, ¶¶ 62–66], for intentional interference with business relations, [R. 44 at 29–30, ¶¶ 67–71], and for abuse of process, [R. 44 at 30, ¶¶ 72–74], against all of those concerned. In a prior opinion, the Court dismissed the claims for racketeering, breach of fiduciary duty, and for abuse of process. [R. 103 (Memorandum Opinion).] Currently before the court is Jones's Motion for Summary Judgment on Griffin's claims.

## STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the parties moving for summary judgment, Jones and his related entities must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Griffin's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming that Jones and his related entities satisfy their burden of production, Griffin "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

DISCUSSION

Defendants move for summary judgment on Griffin's claims and also request that the Court strike the declarations of five witnesses attached as part of Griffin's opposition to the pending Motion for Summary Judgment.[2] [R. 201 (Reply).] Griffin opposes that request in full. [R. 210 (Response to Motion to Strike).] The Court recognizes the importance of these declarations in supporting Griffin's arguments, as well as the likely occurrence that certain arguments of both parties will change with today's holdings. Therefore, this opinion will only analyze the Defendants' request to disregard the declarations.

## I. Defendants' Request to Strike the Declarations of Hoover, White, and Foster.

Pursuant to Federal Rule of Civil Procedure 37(c)(1), Jones urges the Court to disregard the declarations of Kenny Hoover, Michael White, and Dan Foster. [R. 201 at 5–7.] To start, Jones claims that none of the three gentlemen were timely disclosed under Federal Rule of Civil Procedure 26(a)(1). [R. 201 at 5–7.] It is undisputed that Griffin did not name Hoover, White, or Foster in his initial disclosures or in his responses to interrogatories some three years ago. [*See* R. 201-1 at 3–6 (Initial Disclosures); R. 201-2 at 4 (Response to Interrogatories).] The

---

[2] In addition, Charles Jones raises a number of objections to a memorandum allegedly authored by Myles MacDonald. [R. 201 at 13–14 (Reply in Support of Motion for Summary Judgment) (citing R. 197-6 (MacDonald Memorandum)).] The memorandum is mentioned but once in an isolated footnote of David Griffin's briefing. [*See* R. 197 at 12 n.1 (Response in Opposition to Motion for Summary Judgment).]. The information is immaterial to resolving Jones' motion for summary judgment, and so the Court need not—and does not—rely on that exhibit. Therefore, Jones' request to strike the memorandum is moot.

reason for the omission, Griffin explains, is that he did not learn of Hoover, White, and Foster's relevance to this litigation until a few months ago. [R. 210 at 2–3.] His failure to list them at that time is, therefore, understandable. *See Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 568 (6th Cir. 2016).

Perhaps more to the point, Jones faults Griffin for not timely supplementing his initial disclosures and responses to interrogatories in accordance with Federal Rule of Civil Procedure 26(e)(1). [R. 201 at 5–7.] Although Griffin disagrees with that assessment, he says the failure, if any, was substantially justified or harmless. [R. 210 at 3–6.] To resolve this motion, the Court assumes that Griffin failed to timely supplement his earlier disclosures and responses as required under Rule 26(e)(1). Nevertheless, the Court holds that the belated disclosure of Hoover, White, and Foster was substantially justified or harmless within the meaning of Rule 37(c)(1).

Federal Rule of Civil Procedure 26 sets forth a general framework to regulate pretrial discovery. Two provisions are of importance to this dispute: Rule 26(a)(1) and (e)(1). Rule 26(a)(1) requires a litigant to disclose "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e)(1), in turn, imposes a duty to timely supplement or correct prior disclosures and discovery responses "if [a litigant] learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Federal Rule of Civil Procedure 37 dovetails with those requirements: If a litigant "fails to provide information or identify a witness as required by Rule 26(a) or (e), the [litigant] is not

allowed to use that information or witness to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Exclusion "of late or undisclosed evidence is the usual remedy for noncompliance with Rule 26(a) or (e)." *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015). But that is not always the case, as the Rule gives the Court "the option to order alternative sanctions 'instead of' exclusion of the late or undisclosed evidence 'on motion and after giving an opportunity to be heard.'" *Id.* (quoting Fed. R. Civ. P. 37(c)(1)); *see also* 8B Charles Alan Wright et al., *Federal Practice and Procedure* § 2289.1 (3d ed.), Westlaw (database updated Apr. 2017).

Nonetheless, Griffin may avoid sanction if "there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (quoting *Vance ex rel. Hammons v. United States*, 182 F.3d 920, 1999 WL 455435, at *6 (6th Cir. 1999) (unpublished table decision)). To assess whether a litigant's belated disclosure is "substantially justified" or "harmless," courts in this Circuit look to five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe*, 801 F.3d at 748 (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)); *see also Abrams v. Nucor Steel Marion, Inc.*, —— F. App'x ——, ——, 2017 WL 2297486, at *6 (6th Cir. 2017). These factors simply lend themselves "to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Bentley v. Highlands Hosp. Corp.*, No. CV 15-97-ART-EBA, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016) (quoting *Howe*, 801 F.3d at 747, 749).

The balance weighs in Griffin's favor. First, the surprise to Jones is somewhat troublesome. Although Hoover, White, and Foster's names came up in passing during a handful of depositions, [*see, e.g.*, R. 208-1 at 129 (Cohoon's Deposition); R. 208-5 at 140 (Jones' Deposition)], none of them were disclosed as possible witnesses until after the close of discovery. On the flip side, it appears as though Jones is not altogether unfamiliar with Hoover, White, and Foster. He has either employed or transacted business with each over a number of years. [*See* R. 197-2 at 2, ¶ 2 (Hoover's Declaration); R. 197-3 at 2, ¶ 2 (White's Declaration); R. 197-5 at 2, ¶¶ 2–3 (Foster's Declaration).] Still, the issue of surprise weighs against Griffin.

Second, there is enough time to cure the surprise to Jones. The recent unearthing of these witnesses supplies the good cause needed to reopen discovery for the limited purpose of allowing Jones to depose Hoover, White, and Foster. The opportunity to take their depositions ameliorates much of the surprise. *See Smith v. State Farm Mutual Auto. Ins. Co.*, No. CV 5:15-375-KKC, 2017 WL 107971, at *2 (E.D. Ky. Jan. 11, 2017); *Boegh v. United States*, No. 5:08-CV-00150-R, 2010 WL 4286150, at *1 (W.D. Ky. Oct. 22, 2010). Therefore, the ability to cure weighs in favor of Griffin.

Third, no disruption of the trial resulted, or will result, from the belated disclosure. Due to a related bankruptcy proceeding, there is no date set for the trial of this action. Reopening discovery for the limited purpose of deposing Hoover, White, and Foster will not frustrate the expedient resolution of this litigation. *See Pacheco v. Johnson*, No. 3:11-CV-221, 2017 WL 732313, at *3 (M.D. Tenn. Feb. 21, 2017). Accordingly, the lack of disruption or delay strongly favors Griffin.

Fourth, the tardy evidence is important to resolving this case on its merits. Hoover, White, and Foster's testimony, as discussed in detail later, goes a long way toward raising issues

of material fact about many of Griffin's claims.  Therefore, the importance of the evidence

weighs against Griffin.[3]

Fifth, Griffin attempts to offer a justification for the belated disclosure.  His explanation

is as follows:  Hoover, White, and Foster first came to the attention of Griffin's counsel

sometime around May 2016 in connection with Jones' bankruptcy.  [R. 210-1 at 2, ¶ 3 (Greene's

Declaration).]  By that time, the deadline to complete discovery and file dispositive motions had

lapsed, [R. 118 at 2, ¶¶ 1, 5 (Amended Scheduling Order)], and the Court had vacated all

schedules and stayed this action due to the bankruptcy proceeding, [R. 186 at 1 (Order of May 6,

2016)].  The stay of litigation remained in effect until August 5, at which time the Court granted

the parties leave to file dispositive motions.  [R. 189 at 1 (Order of August 5, 2016).]  Jones filed

this dispositive motion on September 1.  Soon thereafter, Griffin's counsel reached out to

Hoover, White, and Foster to schedule in-person interviews with them.  [R. 210-1 at 2, ¶ 4.]

Based on those interactions, he drafted the objected-to declarations between October 11 and 15,

and then tendered copies to opposing counsel a week or so later.  [*Id.* at 2–3, ¶¶ 4, 6.]  In light of

the short period of time between obtaining and serving the declarations, Griffin's counsel

considered formal supplementation to be unnecessary.  [*Id.* at 3, ¶ 6.]

Nothing about the foregoing recitation smacks of gamesmanship.  Instead, Griffin's

belated disclosure of Hoover, White, and Foster more likely resulted from negligence, confusion,

or lack of information on his part.  Therefore, the final factor does not tilt for or against Griffin.

*See Redmond*, 194 F. Supp. 3d at 614.

---

[3] There is some disagreement about which side benefits from the importance of belatedly-disclosed evidence.  *Compare Smith*, 2017 WL 107971, at *2 (holding importance of evidence weighed in nonmovant's favor), *Bentley*, 2016 WL 5867496, at *11 (same), *Etheridge v. E. I. DuPont De Nemours & Co.*, No. 14-CV-2443-SHL-CGC, 2015 WL 12516227, at *3 (W.D. Tenn. Oct. 14, 2015) (same), *Redmond*, 194 F. Supp. 3d at 614 (same), *and Askew v. City of Memphis*, No. 14-CV-02080-STA-TMP, 2016 WL 4533587, at *6 (W.D. Tenn. Mar. 15, 2016) (same), *with EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 5:16-CV-JHM-REW, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017) (holding importance of evidence weighed in movant's favor).

To summarize, the balance of the pertinent factors, albeit close, weighs in Griffin's favor. The Court holds that the late disclosure of Hoover, White, and Foster is substantially justified or harmless within the meaning of Rule 37(c)(1). Their declarations will not be excluded under that Rule. However, the Court will reopen discovery for the narrow purpose of permitting Jones to take Hoover, White, and Foster's depositions if he so chooses.

## II. Defendants' Request to Strike the Declarations of Mark Whitaker and Griffin.

Second, Jones asks the Court to disregard the affidavits of Griffin and Mark Whitaker as self-serving sham affidavits. [R. 201 at 7– 14.] Griffin opposes that portion of the request to strike too. [R. 210 at 6–11.]

Under the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition)." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *accord Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). An affidavit which directly contradicts prior sworn testimony ought to be disregarded "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (quoting *Aeral, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). If, on the other hand, there is no direct contradiction, then the affidavit should be disregarded only "if it is 'an attempt to create a sham fact issue.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aeral*, 448 F.3d at 908–09). The presence of sham fact issue turns on

[1] whether the affiant was cross-examined during his earlier testimony, [2] whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and [3] whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Aeral*, 448 F.3d at 909 (last alteration in original) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

## A. Whitaker's Declaration

With respect to Whitaker, Jones takes issue with two alleged inconsistencies between his examination in a related bankruptcy proceeding and his declaration. The first relates to Whitaker's knowledge of how Griffin's funds were handled. [R. 201 at 11 (citing R. 201-3 at 43–44, 69–70, 137–38 (Whitaker's Rule 2004 Examination).] During his examination, Whitaker testified:

> Q. Okay. So if I understand it correctly—and tell me if I get this wrong—you were talking about, hey, we're short in a particular company; hey, let's reach out to Denise or David [Griffin] to see if we can get more funds. And Mr. Wright might make that call or Ms. Bone or Chuck, himself, and they would request the funds?
>
> A. Yes.
>
> Q. And then do you know how the funds were handled coming in?
>
> A. No. I have no knowledge of that.
>
> Q. Did you ever discuss the funds going into S-E-B, for example, into their account?
>
> A. No.
>
> Q. C-B-R?
>
> A. No.

[R. 201-3 at 137–38.] Whitaker's declaration, however, paints a different picture:

> I am aware that David Griffin was a part owner of several textbook companies with Mr. Jones, including SE Book Company ("SEB") and College

Book Renters ("CBR") and that over a period of several years, Mr. Griffin invested a great deal money in SEB. From time to time, when money would come into SEB from Mr. Griffin, those funds would be transferred from SEB at the direction of Mr. Jones to other companies in which Mr. Griffin had no interest and would be used for purposes other than the business of the book companies. Neither I, nor to my knowledge Mr. Jones or anyone else working for him, ever advised Mr. Griffin that his funds were being used for non-textbook business purposes.

[R. 197-4 at 2–3, ¶ 3.]

Griffin does not provide an explanation for why Whitaker's testimony changed from having no knowledge of how Griffin's funds were handled to a rather detailed understanding of how Jones transferred funds from Griffin to other companies. Instead, he argues that Mr. Whitaker's declaration should not be excluded due to independent evidence in the record that bolsters his testimony. [R. 210 at 8 (citing *Baer v. Chase*, 392 F.3d 609, 625 (3rd Cir. 2004))].[4] Griffin cites to depositions of Jones and Wright, as well as a 2004 examination of Whitaker, to support his argument that Jones had the authority to transfer money that may have originated from Griffin between the companies as he saw fit. [R. 210 at 8 (citing Jones Dep. [R. 147] at 299-301; Wright Dep. [R. 209-2] at 47; Whitaker Examination [R. 209-1])]. Even if this is so, none of these documents mention Whitaker's knowledge of Jones transferring Griffin's money between businesses. Before, Whitaker testified that he had no knowledge of how funds were handled. [R. 201-3 at 137-38]. Now, Whitaker has obtained this knowledge and describes how Jones transferred funds from Griffin to other companies belonging to himself. [R. 197-4 at 2-3, ¶ 3.]. Without an explanation as to Whitaker's new found knowledge or evidence that he knew this information at the time of the first deposition, the Court concludes that Whitaker's declaration

---

[4] In *Baer*, the plaintiff supported his claim that he helped the defendant with a screenplay after 1995 (in contrast to what he stated in an earlier deposition) by providing a letter he wrote to the defendant, dated as of 1997, in which he discussed that screenplay. (392 F.3d at 625-26). Here, there is no such documentation demonstrating that Whitaker previously knew that Jones directed the transfer funds from Griffin to other companies in which Griffin had no interest.

contradicts prior testimony within his examination and, therefore, the portions of his declaration detailing how Jones transferred funds away from Griffin will not be considered at this time.

The second alleged contradiction pertains to Whitaker's knowledge of the companies' inventory audits. [R. 201 at 12 (citing R. 201-3 at 250–51).] The relevant portion of his examination reads:

> Q. Did you ever observe [Art] Sparks or anyone else with A-T-A doing audits of inventory for I-C-S?
>
> A. For I-C-S? No.
>
> Q. What about for the book companies?
>
> A. I was involved in one initial count. I don't know if Art [Sparks] was part of that one. We were going to count the whole inventory for a Navision update. But, of course, we had computer issues about halfway through and stopped. That was my inventory experience.
>
> Q. So, literally in the warehouse counting books?
>
> A. Yes, sir.
>
> Q. Did you find anything during that process that—any irregularities or problems with where the books were supposed to be, how many there were supposed to be, whether they were properly traceable in the system, that sort of thing; things that an audit would look for?
>
> A. It seemed very normal to me.

[R. 201-3 at 250–51.] In contrast, Whitaker's declaration makes the following allegations:

> From time to time, Art Sparks and his accounting firm Alexander Thompson Arnold, would perform audits of the inventory of SEB and CBR. Mr. Sparks would advise Mr. Jones in advance that the inventory would need to be counted. On those occasions, I heard Mr. Jones ask how many books would be required to be physically counted as part of the audit. Mr. Jones then instructed us to select an appropriate number of bins and to place the required number of books in those bins. These bins were then listed on a document as having been randomly selected for counting. The representatives of the accounting firm conducting the audit would be provided the list of bins to examine and would count the books in those identified bins only, without examining any of the other bins in the warehouse. Neither I, nor to my knowledge Mr. Jones or anyone else working for

him, ever advised Mr. Griffin or any of the banks lending money to SEB and CBR that the random audits were being conducted in this fashion.

[R. 197-4 at 3, ¶ 4.]

In this instance, Griffin attempts to explain the inconsistency between the two statements by arguing that "normal" in the "Jones World" meant pre-loading books in specific bins in order to conceal missing, stolen, or altered books at the time of an audit. [R. 210 at 9]. However, upon examination of the preceding question, it is clear that Whitaker's answer of "[i]t seemed very normal to me," meant that there were no "irregularities or problems with where the books were supposed to be, how many there were supposed to be, [or] whether they were properly traceable in the system." [R. 201-3 at 250-51]. In contrast, in his most recent declaration, Whitaker describes a methodical approach to deceive audits of the books that is a far cry from a system free of "irregularities or problems" one might define as "normal." [R. 197-4 at 3, ¶ 4.] Therefore, the Court finds Griffin's explanation unsatisfactory.

Griffin also cited to a deposition of John Wittman in an attempt to, once again, bolster the most recent testimony concerning "phantom inventory" that inflated the assets of the company. [R. 210 at 9]. As before, this testimony made no mention of Whitaker's knowledge concerning this misleading conduct and whether he knew of it at the time of the first deposition, [R. 201-3], despite his statement that it all seemed "normal." The Court concludes that Whitaker's declaration contradicts prior testimony and, therefore, the portions of his declaration concerning activities performed in order to deceive the audits of the book inventory shall be disregarded by the Court at this time.

### B. Griffin's Declaration

With respect to Griffin, Jones takes issue with three alleged inconsistencies between his deposition and subsequent declaration. The first pertains to Griffin's decision to invest in ICS. [R. 201 at 9 (citing R. 152-1 at 27–28 (Griffin's Deposition II).] When asked about that subject during his deposition, Griffin testified as follows:

> Q.    Okay.  Let's go back and—what do you recall about discussions with [Charles] Jones about investing in ICS?
>
> A.    I don't recall much about that.
>
> Q.    Do you recall any statements that he made to you about investing in that company?
>
> A.    I'm sure we talked about it.  It's been so long ago I don't remember it, you know.  I don't remember the conversations.
>
> Q.    Did he provide you any documents?
>
> A.    I'm not sure.

[R. 152-1 at 28.]  Griffin's declaration, however, is more descriptive:

> I purchased the stock in both Cabling Concepts and ICS based on representations from Mr. Jones.  He told me that Cabling Concepts and ICS were companies whose business was based on a federal subsidy program known as "eRate." According to Mr. Jones, third party vendors, such as Cabling Concepts and ICS, would enter into contracts with school districts to provide infrastructure (such as network cabling in the case of Cabling Concepts) or Internet access and services (in the case of ICS).  Under the subsidy program, the school districts would be responsible for paying only 20% of the invoiced amount, with the federal eRate [program] paying the remaining 80% of the bill.

[R. 197-1 at 3, ¶ 3.]

First, Griffin argues that he has maintained that he relied on Jones's representations about the companies, including ICS, from the outset of litigation. [R. 210 at 10]. Griffin provides an affidavit from 2012 in support of this assertion. [R. 210 at 10 (citing Griffin Affidavit dated February 28, 2012, (Exh. 5) at ¶ ¶ 5, 8.).] The Court concludes that the portion of Griffin's

declaration stating that he purchased stock based on Jones's representations will not be disregarded by the Court.

In addition, Griffin attempts to explain why he is now able to remember the specifics about Jones's representations, including an explanation of the eRate program. He says the five years of litigation has given him an opportunity to better understand the federal subsidy program. [R.210 at 10.] This still does not explain the contradiction between Griffin not remembering the discussion with Jones about investing in ICS in the first deposition and Griffin describing the details of this discussion with Jones, including an explanation of eRate, in the most recent declaration. Furthermore, precedent supports disregarding an affidavit containing significant, descriptive details as conflicting testimony when it attempts to remedy a prior deposition in which the same witness claimed a lapse in memory. *See Loadman Grp. v. Banco Popular N. Am.*, No. 4:10cv1759LIO, 2013 WL 1154528, at *4 (N.D. Ohio March 19, 2013) ("When a witness claims a complete loss of memory during his deposition, but later describes significant details in his affidavit, courts often strike the affidavit as conflicting testimony.") (citing *Reid* 790 F.2d at 459-60; *Smith v. Consol. Rail Corp.*, No. 95-3727, 1996 WL 366283, at *1 (6th Cir. June 28, 1996)); *see also McClain v. Mason Co.*, 618 F. App'x 262, 266 (6th Cir. 2015) (stating that the plaintiff's declaration about filing a grievance on February 22 contradicted two earlier depositions, one of which stated he did not remember filing a grievance on such date). Therefore, the Court concludes that this portion of Griffin's declaration describing Jones's account of Cabling Concepts and ICS will not be considered by the Court at this time.

The second purported contradiction involves allegations that Jones colluded with Art Sparks in order to overstate the financial position and assets of the companies. [R. 201 at 10 (citing R. 152-1 at 48–52).] The most pertinent portion of deposition transcript reads:

Q.      Okay.  What other information causes you to believe the financial reporting that you received was inaccurate, other than what you've told us already?

A.      Well, I think the information that Mr. Sparks provided was very inaccurate.

Q.      Yes, sir.  And why do you think that?

A.      It was a valuation he had on the books to what was actually there.

Q.      And why do you believe that was inaccurate?

A.      I don't know why it's inaccurate.  I just—what he said was there, and at the end it wasn't there.  It wasn't even close to there.  Where did $50 million worth of books go?

[R. 152-1 at 51–52.]  In his declaration, Griffin elaborates as follows:

When making my decisions to invest in the Joint Companies and to guarantee bank debt for those companies, in addition to the representations made to me by Mr. Jones, I also relied on the involvement of Art Sparks, CPA and his accounting firm Alexander Thompson Arnold, PLLC ("ATA") who appeared to me to be a well[-]respected independent accounting firm that was engaged to perform annual audits of the Joint Companies.  Neither Mr. Jones nor Mr. Sparks ever disclosed to me that there was an arrangement between Mr. Jones and Mr. Sparks or ATA to evade the normal audit controls by providing Mr. Jones advance knowledge of which book bins would be subject to random inspection for the purposes of the audit and filled with books to successfully demonstrate the required inventory. Had such a disclosure been made, I would not have invested in any company with which either Mr. Jones or Mr. Sparks was associated and would not have made direct advances to or guaranteed any debt for any such company.

[R. 197-1 at 4–5, ¶ 7.]

The Court does not interpret this discrepancy to be directly contradictory or an attempt to create a sham fact. Earlier in his deposition, Griffin mentioned receiving information as well as having conversations with Myles MacDonald about missing inventory. [R. 152-1 at 49-51.] Griffin stated, in support of his beliefs that Jones and Sparks were inflating inventory, that MacDonald provided documents to him that proved the inventory numbers were false. [R. 152-1 at 50-51]. The earlier testimony here "reflects confusion" surrounding the inventory numbers

that "the affidavit attempts to explain" by describing the arrangement between Jones and Sparks. *Aeral*, 448 F.3d at 909. It is also possible that this affidavit "was based on newly discovered evidence" that came to Griffin's attention in between the time of the deposition and the affidavit. *Id*. Thus, the affidavit is not contradictory nor does it create a sham fact, and the Court will not disregard this portion of the affidavit.

The last of the alleged contradictions relates to the compensation Jones received to operate the companies. [R. 201 at 10–11.] It does not appear that Griffin discussed Jones' compensation scheme during his deposition. Nonetheless, such an omission is inconsistent—at least from Jones' perspective—with Griffin's subsequent declaration, which reads:

> Prior to my investing in any of the Joint Companies, Mr. Jones explained to me that his management of the companies would be conducted through a management company, C.A. Jones Management ("Jones Management"), which would provide the employees and arrange to pay the expenses of the Joint Companies. He told me that Jones Management would bill the Joint Companies for the actual costs incurred by Jones Management on behalf of the Joint Companies, plus a salary for him of $250,000 per year. This was a very material representation to me, because pursuant to our arrangement, I was providing tens of millions of dollars of financing to companies in which Mr. Jones owned 50%. He assured me, and I believed, that apart from the profits (which would be split equally) he would only charge the Joint Companies a total of $250,000 per year to come out of the financing provided by me.

[R. 197-1 at 4–5, ¶ 7.]

The Court is unpersuaded. The sham affidavit doctrine does not prevent "a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." *Aeral*, 448 F.3d at 907. An affidavit of that sort merely "fills a gap left open by" the party moving for summary judgment. *Id.* The declaration falls into that category because Jones failed to demonstrate that his attorney questioned Griffin about this topic at his deposition. In short, the declaration is not offered to create a sham issue of fact and shall not be disregarded by the Court.

In summary, the Court will not exclude the declarations of Hoover, [R. 197-2], White, [R. 197-3], and Foster, [R. 197-5], however, the previously described portions of Whitaker, [R. 197-4], and Griffin's, [R. 197-1], declarations will not be considered by the Court at this time.


CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [R. 190] is **DENIED WITH LEAVE TO REFILE**.

A telephonic status conference is set on 9/19/2017 at 11:00 a.m. Central Time. Counsel must call 1-877-848-7030 then give the Access Code 2523122  and #, then when prompted press # again to join the call.

IT IS SO ORDERED.

cc: Counsel